## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TAMERA S. LECHNER, individually, on behalf of the MUTUAL OF OMAHA 401(k) LONG-TERM SAVINGS PLAN and on behalf of a class of all those similarly situated | ) ) ) ) | |
| *Plaintiff*, | ) ) ) | Case No.: _____ |
| v. | ) ) | Judge: _____ |
| MUTUAL OF OMAHA INSURANCE COMPANY, UNITED OF OMAHA LIFE INSURANCE COMPANY and JOHN DOES 1-50, | ) ) ) ) ) | |
| *Defendants*. | ) ) | ***JURY TRIAL DEMANDED*** |

## CLASS ACTION COMPLAINT – ERISA

### PRELIMINARY STATEMENT

1.      Plaintiff Tamera S. Lechner, a participant in the Mutual of Omaha 401(k) Long-Term Savings Plan (the "Plan"), brings this action on behalf of the Plan and as a class action on behalf of  all similarly situated participants in and beneficiaries of the Plan. She brings this action under Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3).

2.      Mutual of Omaha Insurance Company ("Mutual of Omaha") is an insurance company incorporated under the laws of the State of Nebraska.

3.      Mutual of Omaha sponsors the Plan to provide retirement benefits to employees of Mutual of Omaha and certain of its subsidiaries, including its wholly owned subsidiary, United of Omaha Life Insurance Company ("United of Omaha").

4.      The Plan is an individual account, defined contribution pension plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.

5.      The Plan is funded by a combination of salary withholding by plan participants and employer matching contributions.

6.      Participants can direct the retirement savings in their Plan accounts into a variety of investment options.

7.      Participant accounts in the Plan are comprised of employee contributions, any employer contributions and any investment income from the investment options selected within the participant account, less fees and expenses. *See Evans v. Akers*, 534 F.3d 65, 70 (1st Cir. 2008) ("A defined contribution plan 'promises the participant the value of an individual account at retirement.' ... This value is a function of the employee's contributions, plus vested employer matching contributions and investment gains, minus investment losses and any allocable expenses.").

8.      Unlike traditional defined benefit pension plans, which obligate employers to pay a particular amount at retirement (benefits that are guaranteed by the Pension Benefit Guarantee Corporation), participants in defined contribution plans (like the Plan) get no more at retirement than they have in their accounts at that time.

9.      Like the fiduciaries of other defined contribution plans, the Plan's fiduciaries select the investment options into which participants can direct the money in their retirement accounts in the Plan.

10.     ERISA plan fiduciaries are required to select investment options for their plans prudently and loyally – that is, solely in the interests of the Plan and its participants. ERISA § 404(a), *codified at* 29 U.S.C. § 1104(a).

2

11.    The assets of ERISA-covered retirement plans, including the Plan, must be held in trust, segregated from an employer's other assets, and under no circumstances may plan assets inure to the benefit of an employer that sponsors a plan. ERISA § 403(a) & (c), 29 U.S.C. § 1103(a) & (c).

12.    Here, as set forth in more detail below, the Plan's fiduciaries violated those fiduciary duties by selecting numerous investment options not to benefit the Plan or its employees, but because they paid fees to Mutual of Omaha or its subsidiaries.

13.    In particular:

a. The Plan's fiduciaries selected United of Omaha-branded investment funds when each of these Omaha-branded funds invested all of its assets in another publicly available investment fund managed by an unrelated third party – causing the Plan to pay a fee to United of Omaha in addition to the fee charged by the underlying fund's manager when the Plan could simply have offered the underlying fund and avoided paying any additional fee to United of Omaha;

b. For several of the non-United of Omaha funds offered in the Plan, the Plan's fiduciaries simply added on a fee in addition to the fee charged by the fund;

c. The Plan's fiduciaries included several United of Omaha-branded Mutual GlidePath target date funds, which charged Plan participants more than non-Plan investors paid to invest in those funds;

d. The Plan's fiduciaries constructed several asset-allocation funds (the "Mutual Directions" funds), which automatically allocated participants' savings to other funds based on risk parameters identified by the participants. United of Omaha

added additional fees to the Mutual Directions funds in addition to those charged by the underlying funds; and

e. The Plan's fiduciaries elected to include in the Plan a capital preservation option called the Guaranteed Account, which was managed by United of Omaha, despite scores of other better capital preservation funds on the market simply because the Guaranteed Account paid significant fees to United of Omaha.

14.     The Plan's fiduciaries, who are the defendants in this case, used their position of trust to line the pockets of Mutual of Omaha and United of Omaha, its subsidiary, at the expense of the Plan and its participants, larding the Plan with excessive and unnecessary fees that diminished the assets in the participants' retirement accounts in order to benefit Mutual of Omaha and its subsidiaries.

15.     Plaintiff seeks damages and equitable relief on behalf of the Plan.

### THE PARTIES AND THE PLAN

16.     The Mutual of Omaha 401(k) Long-Term Savings Plan (the "Plan") is a participant-directed, individual account, defined contribution retirement savings plan covered by ERISA within the meaning of ERISA § 3(2) and (34).

17.     Plaintiff Tamera S. Lechner is a participant in the Plan. Through the Plan, Lechner invested in the Mid Cap Stock Index Fund, the Royce Total Return Fund, the Mutual Direction 5 Fund, the International Developed Countries Fund, the International Stock Index Fund, and the Wells Fargo Advantage Emerging Markets Fund. Lechner is a citizen and resident of Arizona.

18.     Defendant Mutual of Omaha is a Nebraska insurance company with its principal place of business in Omaha, Nebraska. Mutual of Omaha is the sponsor of the Plan. On information and belief, Mutual of Omaha was the Plan's named fiduciary and exercised authority or *de facto*

4

control over selecting the Plan's investments, selecting the Plan's investment managers, deciding that the Plan would retain United of Omaha as an investment manager and service provider, or otherwise deciding that the Plan would pay fees to United of Omaha.

19.     Defendant United of Omaha is a Nebraska insurance company with its principal place of business in Omaha, Nebraska. United of Omaha is a wholly owned subsidiary of Mutual of Omaha. On information and belief, United of Omaha exercised authority or *de facto* control over selecting the Plan's investments, selecting the Plan's investment managers, deciding that the Plan would retain United of Omaha as an investment manager and service provider, or otherwise deciding that the Plan would pay fees to United of Omaha.

20.     Defendants John Does 1-50 are any other employees of Mutual of Omaha or United of Omaha, including without limitation the members of Mutual of Omaha's Retirement Plans Administrative Committee, who exercised any authority or *de facto* control over selecting the Plan's investments, selecting the Plan's investment managers, deciding that the Plan would retain United of Omaha as an investment manager and service provider, or otherwise deciding that the Plan would pay fees to United of Omaha. Plaintiff has been unable to identify the individuals named as John Does 1-50. Plaintiff will endeavor to identify those individuals and entities in discovery and will seek leave to amend the complaint to name them once their identities have been ascertained.

21.     The "Fiduciary Defendants" include Mutual of Omaha, United of Omaha and Defendants John Does 1-50 to the extent that they exercised any authority or *de facto* control over selecting the Plan's investments, selecting the Plan's investment managers, deciding that the Plan would retain United of Omaha as an investment manager and service provider, or otherwise deciding that the Plan would pay fees to United of Omaha.

## JURISDICTION AND VENUE

22.     Plaintiff brings this action pursuant to ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3).

23.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

24.     Venue lies in the District of Nebraska pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) and 28 U.S.C. §§ 1391(b) and (c), because Mutual of Omaha and United of Omaha reside within or may be found in this district, the Plan is administered in this district, and/or the alleged breaches of the duties imposed by ERISA took place in this district.

25.     The Court has general personal jurisdiction over Defendants Mutual of Omaha and United of Omaha because they are organized under Nebraska law and/or have their principal places of business within this district. On information and belief, John Does 1-50 are citizens and residents of Nebraska.

26.     The Court has specific personal jurisdiction over the Fiduciary Defendants because they provided services for the Plan in this district and engaged in the conduct described herein which took place in and was specifically directed towards this district.

## FACTS

27.     The Plan, as is typical of many defined contribution retirement plans, designates a number of mutual funds, separate accounts or other collective investment funds as "designated investment alternatives" and gives individual Plan participants the ability to choose how their Plan accounts will be invested by allocating their accounts among the designated investment alternatives.

6

28.     Fiduciaries for retirement plans owe the plan and its participants and beneficiaries duties described as among the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982); *Braden v. Walmart Stores, Inc.*, 588 F.3d 585, 602 (8th Cir. 2009).

29.     When choosing investment options for a Plan, an ERISA plan fiduciary is required to act with the care, skill, prudence and diligence that would be exercised by someone who is experienced and knowledgeable about the services to be provided; a prudent expert, in other words. Most fundamentally, ERISA fiduciaries are required to act solely in the best interests of plan participants. ERISA § 404(a)(1), 29 U.S.C. 1104(a)(1).

30.     Specifically with respect to that fundamental fiduciary obligation, ERISA prohibits a plan fiduciary from: (i) dealing with the assets of the plan for its own benefit or for its own account; (ii) representing a party or acting in a transaction on behalf of a party whose interests are adverse to the interests of the plan or its participants; and (iii) receiving for its own account any consideration from a party dealing with such plan in a transaction involving plan assets. ERISA § 406(b), 29 U.S.C. § 1106(b).

31.     These fiduciary duties are especially important in the context of fees paid by defined contribution plan participants, as the fees reduce dollar for dollar (and more, when compounded) the amount of benefits participants will receive at retirement.

32.     As the Supreme Court explained in 2015, in defined contribution plans, employees' benefits at retirement "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

33.     Thus, over time, even small differences in fees and performance compound and can result in vast differences in the amount of savings available at retirement "[e]xpenses, such as

management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

34.     In the context of individual account defined contribution plans, additional fees of only 0.18% (eighteen hundredths of one percent, or 18 basis points) can have a large detrimental effect on investment results over time, because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1190 (9th Cir. 2016) (*en banc*).

35.     Under the Plan, the Fiduciary Defendants had ultimate responsibility for the investment options made available to participants in the Plan.

36.     Instead of exercising that discretion in the best interests of the Plan and its participants as required by ERISA, the Fiduciary Defendants selected numerous investment options for inclusion in the Plan solely to line the pockets of Mutual of Omaha at the expense of the Plan and its participants.

37.     First, the Plan's menu of investment choices, as selected by the Fiduciary Defendants, includes multiple United of Omaha-branded investment funds, each of which invests 100% of its assets into another publicly available investment fund.

38.     The United of Omaha-branded investment funds charged significantly higher fees that the underlying funds. United of Omaha simply takes the money, purchases shares of another fund, and deducts an additional fee. Even though the Plan could simply have invested directly in the underlying funds, the Fiduciary Defendants selected the United of Omaha fund instead.

39.     For example, the United of Omaha Stock Market Index Fund included in the Plan invests 100% of its assets in a State Street S&P 500 Index fund.  The underlying State Street fund

charges investors 6 basis points.  The United of Omaha Stock Market Index Fund, however, charges Plan participants 38 basis points.

40.     That 38 basis point fee (and others like it throughout the Plan, including fee amounts Plaintiff was charged by Defendants on the mutual funds in which she invested through the Plan) is excessive and, to that extent, unwarranted and wrongful.

41.     At least seven other of the Plan's investment choices operate the same way, including the Bond Index Fund, the Growth Stock Index Fund, the Mid-Cap Stock Index Fund, the Small Cap Stock Index Fund, the Small Company Fund, the Value Stock Index Fund, and the International Stock Index Fund.  The International Developed Countries Fund invests exclusively in two underlying mutual funds, but employs a similar "mark-up" of fees for both of the underlying funds.

42.     Each of these proprietary United of Omaha funds charged participants, including Plaintiff and the proposed Class, approximately 30 basis points more to invest in the underlying investment fund than Plan participants would pay had they invested directly in the underlying funds that are the sole investment of the respective United of Omaha funds.

43.     Second, Defendants also caused the Plan to overcharge participants for investing in the non-proprietary funds that were included in the Plan.  The actual expense ratio for each of the Vanguard Windsor II Fund, T. Rowe Price Growth Stock Fund, and John Hancock Disciplined Value Mid Cap Fund (as they are sold to investors not purchasing them through the Plan) is at least 25 basis points less than the expense ratio being charged to Plaintiff and other Plan participants for investing in those funds through the Plan.

44.     For example, the T Rowe Price Growth Stock Fund charges investors 52 basis points. United of Omaha charges Plan participants 87 basis points for the same fund.

9

45.     The overcharging is pervasive and occurs at multiple levels in the Plan.  For example, the Prudential QMA Small Cap Value fund offers to retirement plan investors Class Z shares (expense ratio 70 basis points) and Class Q shares (expense ratio 64 basis points), yet United of Omaha is charging its employees 108 basis points to invest in the fund.

46.     United of Omaha has engaged in the same wrongful practice with new funds added after 2016, charging, for example, 51 basis points to invest in Vanguard target date funds that have an actual expense ratio of 13 basis points.

47.     Third, the actual expense ratio for each of the twelve United of Omaha-branded Mutual GlidePath target date funds included as investment choices in the Plan (again, when sold to non-participant investors outside the Plan) is approximately 30 basis points less than the expense ratio being charged to participants in the Plan for investing in those same Mutual GlidePath funds through the Plan.

48.     Fourth, the Plan also includes five so-called asset-allocation funds: Mutual Directions 1 (Conservative); Mutual Directions 2 (Moderately Conservative); Mutual Directions 3 (Moderate); Mutual Directions 4 (Moderately Aggressive); and Mutual Directions 5 (Aggressive).  Each of these asset allocation funds, in turn, invests principally in others of the United of Omaha proprietary funds and others of the Plan's designated investment alternatives. United of Omaha charges participants between 61 and 88 basis points for investing in these asset allocation funds, even though the weighted average of the expense ratios for the underlying investments is far less.

49.     For example, the asset allocation for the Mutual Directions 4 fund is as follows:

   a.   Stock Index (expense ratio of 38 basis points) – 35%;

   b.   International Developed Countries (expense ratio of 42 basis points) – 25%;

    c.   Bond Index (expense ratio of 41 basis points) – 15%;

    d.   Emerging Markets (expense ratio of 52 basis points) – 10%;

    e.   Small Company Value (expense ratio of 40 basis points)  - 5%

    f.   Prudential QMA Small Cap Value (expense ratio of 108 basis points) – 5% and

    g.   TIPS Index (expense ratio of 41 basis points) – 5%.

50.    The weighted average expense ratio for all of those investments is 44.6 basis points, yet United of Omaha is charging participants 77 basis points to invest in Mutual Directions 4.

51.    Mutual Directions 5, in which Plaintiff Lechner has invested a portion of her account, has a similar asset allocation:

    a.   Stock Index (expense ratio of 38 basis points) – 35%;

    b.   International Developed Countries (expense ratio of 42 basis points) – 30%;

    c.   Emerging Markets (expense ratio of 52 basis points) – 15%;

    d.   Small Company Fund (expense ratio of 98 basis points)  - 10%; and

    e.   Prudential QMA Small Cap Value (expense ratio of 108 basis points) – 10%.

52.    The weighted average expense ratio for all of those investments is 54.3 basis points, yet United of Omaha is charging Lechner and all other participants 88 basis points in fees to invest in Mutual Directions 5.

53.    Fifth, the Fiduciary Defendants caused the Plan to offer the Guaranteed Account by entering into a group annuity contract (the "GAC") with United of Omaha.

54.    Under the GAC, United of Omaha takes the assets contributed to Plan participants' accounts that are directed by participants to be invested in the Guaranteed Account (the "principal amount"), and deposits them in its general account, to be invested along with all the other assets in United of Omaha's general account. Each month, United of Omaha increases the principal

11

amount by adding a "crediting interest rate," which United of Omaha can change monthly and can set as low as zero percent (0%). Contributions to the contract during any month will receive the guaranteed interest rate for that month for five years. The actual earnings of the general account invariably exceed the crediting interest rate.

55.     United of Omaha keeps the difference between the actual earnings on the amounts Plan participants contributed and the crediting interest rate, which is called the "spread."

56.     From the spread, United of Omaha reimburses all of its own costs for providing the Guaranteed Account, charges investment and administrative fees and makes a significant profit.

57.     The GAC effectively enables United of Omaha to determine how much interest it will credit, thus giving United of Omaha (or United of Omaha together with Mutual of Omaha) complete control over how much of the yield from the Guaranteed Account would inure to the benefit of the Plans and how much United of Omaha would keep for its benefit. United of Omaha used its discretionary control over the interest rate to increase its own compensation rather than crediting the participants of the Plan with appropriate returns.

58.     United of Omaha does not disclose the amount of the spread or the return on the underlying assets that back the Guaranteed Account. On information and belief, for several years leading up to the filing of this Complaint, the spread has been larger than the credited interest rate – meaning that United of Omaha has kept more of the investment returns on the underlying assets than it pays to the investors (in this case, the participants in the Plan).

59.     Because United of Omaha is a wholly owned subsidiary of Mutual of Omaha, that profit ultimately inures to the benefit of Mutual of Omaha.

60.     Because the Plan is a defined contribution Plan, the profits retained by United of Omaha directly reduce the benefits Plan participants, such as Plaintiff, are entitled to receive at retirement.

61.     Moreover, there are numerous capital preservation retirement investment options besides the Guaranteed Account available on the market from other investment providers with higher crediting rates (that is, that pay more to retirement plan participant investors). The Fiduciary Defendants could have included one or more of those products in lieu of the Guaranteed Account, or could have set the crediting rate in the Guaranteed Account to be at least as high as these market competitors.

62.     The Fiduciary Defendants were well aware of the conflict of interest between Mutual of Omaha and the Plan's participants when they chose to include the Guaranteed Account as an investment option in the Plan. But they did so anyway in order to provide for the profits United of Omaha would and did generate from offering the Guaranteed Account to the Plan.

63.     The total fees and expenses United of Omaha and Mutual of Omaha received from the markups on the Plan's investment options, and the spread on the Guaranteed Account, greatly exceeded any costs they incurred in maintaining or administering the Plan. Thus a significant portion of those fees represented profit at the expense of the Plan.

64.     Plaintiff estimates that United of Omaha and Mutual of Omaha received, on average, in excess of $1 million per year from the Plan in mark ups alone from 2009 to the present. United of Omaha received additional asset based revenue sharing fees from the managers of the funds (or the underlying funds).

65.     Plaintiff estimates that United of Omaha and Mutual of Omaha received, on average, a spread from the Guaranteed Account of $2 million to $3 million each year.

66.     Again, on information and belief, those millions of dollars in annual revenue from the Plan greatly exceeded the costs that United of Omaha and Mutual of Omaha incurred in managing and administering the Plan. Moreover, the Plan could have received those services from independent third parties on the market for far less.

67.     Between 2009 and 2016, the Plan had over 6,000 participants.

68.     In addition, the Plan had in excess of $500 million in assets each year between 2010 and 2016.

69.     Plans with 6,000 participants and hundreds of millions of dollars in assets are considered very large, and are able to use their size to leverage economies of scale in the market place to pay low administrative and investment expenses.

70.     Based on information currently available to Plaintiff regarding the Plan's features, the nature of the administrative services provided by the Plan's recordkeepers, the Plan's participant level, and the recordkeeping market, benchmarking data indicates that a reasonable market rate for the Plan's recordkeeping expenses would have roughly $200,000 to $300,000 (approximately $35 per participant with an account balance).

71.     On average, based on the revenue estimates cited above, Plan participants were paying United of Omaha and Mutual of Omaha in excess of $500 per participant annually – 10 times or more than the reasonable market rate for retirement plan recordkeeping services.

72.     Thus, instead of using the negotiating power conferred by the Plan's size, the Fiduciary Defendants simply caused the Plan to buy into United of Omaha's incredibly overpriced services – violating ERISA's duty of loyalty and permitting Plan assets to inure to the benefit of United of Omaha and Mutual of Omaha.

14

73.     In addition to its misconduct described above, Mutual of Omaha concealed its self-dealing from Plan participants and never disclosed that it was greatly profiting from the inclusion of the funds at issue here in the Plan.

74.     None of the Fiduciary Defendants disclosed to the Plan's participants either (i) the amount of the spread retained by United of Omaha with respect to the Guaranteed Account or (ii) the substantial and unjustified mark-ups to the expense of investing in the other available investment alternatives.

75.     Moreover, Mutual of Omaha provided official fee disclosures to the Plan's participants falsely, representing that no fees or operating expenses were being charged against the Guaranteed Account when, in fact, United of Omaha was generating significant profits, fees and compensation for itself out of the spread. The fee disclosures provided to Plan participants did not disclose the existence or amount of the spread.

76.     In addition to its disloyalty in including the options and fees for its own benefit as set forth above, the Fiduciary Defendants had numerous opportunities to remove these options and eliminate the excessive fees.

77.     ERISA fiduciaries – like the Fiduciary Defendants here – have an ongoing obligation to monitor and evaluate plan investments and change or remove the investments to ensure the lineup satisfies the obligations imposed by the duties of prudence and loyalty.

78.     Thus, not only did the Fiduciary Defendants violate the most fundamental of fiduciary duties – the duty of loyalty – by including the entire range of proprietary funds so that Mutual of Omaha and United of Omaha could profit at the expense of the Plan's participants, but also the Fiduciary Defendants took great care to conceal from the Plan's participants (including Plaintiff) the facts about the additional and excessive fees added to the Plan's investment choices.

15

## CLASS ACTION ALLEGATIONS

79.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(1) or, in the alternative, 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class of similarly situated persons ("the Class"):

> *All participants in and beneficiaries of the Plan excluding the Fiduciary Defendants.*

80.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are, at a minimum, thousands of Class members.

81.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among such questions are:

a.  Whether the Fiduciary Defendants breached their fiduciary duties of loyalty and/or dealt with the assets of the Plan in their own interest in violation of ERISA §§ 404(a) and 406(b)(1);

b.  Whether the Fiduciary Defendants caused the Plan to engage in transactions prohibited by ERISA § 406(a).

82.     There are no substantial individual questions among the Class claims on the merits of this action, and Plaintiff is not aware of any conflicts between herself and members of the putative Class.

83.     Plaintiff's claims are typical of the claims of the members of the proposed Class, as Plaintiff and all other members of the putative Class were harmed by the Fiduciary Defendants'

16

wrongful conduct. Plaintiff is aggrieved by the prohibited transactions and breaches of fiduciary duties she and all other members of the Class have suffered at the Fiduciary Defendants' hands and is intent on seeing such wrongs remedied. Neither Plaintiff nor her counsel have any interests that might cause them to refrain from vigorously pursuing the claims in this class action. Thus, Plaintiff is an adequate representative of the Class.

84.     Class certification of Plaintiff's Claims for Relief is appropriate under Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the Fiduciary Defendants, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

85.     In the alternative, class certification of Plaintiff's Claims for Relief also is appropriate under Fed. R. Civ. P. 23(b)(3) because common issues of law and fact predominate over questions affecting only individual members of the Class. The only individualized issues here will be the amount of damage each member of the Class incurred from the Fiduciary Defendants' breaches of fiduciary duty and prohibited transactions, and such damages can be readily calculated based on business records maintained by the Fiduciary Defendants. Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Fiduciary Defendants have obtained wrongful profits through overcharges that are, on an individual level, small and difficult to detect but in the aggregate are an enormous drain on Class members' retirement assets. Individual participants in the Plan who have invested in the funds at issue here have an insufficient stake in the outcome of this matter to devote the substantial resources that would be required to pursue this action on an individual basis.

86.     On information and belief, the Class is easily ascertainable because the names and addresses of the Class members are available from the Fiduciary Defendants, and adequate notice can be provided to members of the Class to the extent required by Fed. R. Civ. P. 23.

87.     Plaintiff is committed to fairly, adequately, and vigorously representing and protecting the interests of the members of the Class, and has retained counsel competent and experienced in class action litigation of this nature for this purpose. Thus, the requirements of Rule 23(g) are met.

## CLAIMS

### First Claim for Relief

Breach of ERISA Fiduciary Duties of Loyalty and Prudence, ERISA § 404(a)(1)
Self-Dealing Prohibited Transactions, ERISA § 406(b)
Pursuant to ERISA § 502(a)(2) and (a)(3)
The Fiduciary Defendants

88.     Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

89.     ERISA § 404(a)(1)(A) requires ERISA plan fiduciaries to perform their fiduciary duties and responsibilities (i) with the care, skill, prudence and diligence under the circumstances then prevailing that prudent person, familiar with such matters, would exercise, and (ii) solely in the best interests of Plan participants for the exclusive purpose of providing them benefits under the Plan.

90.     Similarly, ERISA § 406(b)(1) prohibits a fiduciary from dealing with the assets of a plan in its own interest or for its own account.

91.     The Fiduciary Defendants breached their duties of loyalty and prudence under ERISA § 404(a)(1) and dealt with the assets of the Plan in its own interest and for its own account

18

in violation of ERISA § 406(b)(1). The Fiduciary Defendants' disloyal and self-dealing acts are set forth in more detail above, and include, but are not limited to, the following:

    a.   selecting and failing to remove United of Omaha-branded investment funds that exclusively invested in other publicly available investment funds managed by an unrelated third parties solely to charge additional fees;

    b.   adding and failing to remove additional fees for non-United of Omaha branded investment funds included in the Plan;

    c.   including and failing to remove several United of Omaha-branded Mutual GlidePath target date funds which charged Plan participants more than non-Plan investors paid to invest in those funds;

    d.   adding and failing to remove additional fees to the "Mutual Directions" funds beyond those charged by the underlying funds;

    e.   including and failing to remove the Guaranteed Account as an investment option despite the availability of better performing, lower cost capital preservation options in the marketplace; and

    f.   controlling both sides of the crediting rate on the Guaranteed Account with its subsidiary, United of Omaha, regarding the terms of the underlying investment contract to maximize profits for itself and United of Omaha at the expense of Plan participants.

92.    Mutual of Omaha received significant revenues from its wholly owned subsidiary United of Omaha arising out of this course of self-dealing.

93.    ERISA § 502(a)(2) permits plan participants, such as Plaintiff, to bring civil actions for "appropriate relief" under ERISA § 409.

94.     Under ERISA § 409(a), a fiduciary that violates any of ERISA's duties, including ERISA § 404(a)(1)(A) and ERISA § 406(b)(1), must "make good" to the plan the losses to the plan resulting from its violations of ERISA § 404(a)(1)(A) and ERISA § 406(b)(1), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

95.     Thus under ERISA §§ 502(a)(2) and 409(a) the Fiduciary Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 404(a)(1)(A) and ERISA § 406(b)(1), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

96.     ERISA § 502(a)(3) permits a plan participant to bring a civil action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

97.     The Fiduciary Defendants' disloyal conduct and self-dealing violated the provisions of Title 1 of ERISA. The Fiduciary Defendants have profited from the fiduciary violations alleged herein in an amount to be proven at trial, and are in possession of money that belongs in good conscience to the Plan. All such money that belongs in good conscience to the Plan is subject to a constructive trust in favor of the Plan, for which the Fiduciary Defendants serve as constructive trustees. As constructive trustees, under ERISA § 502(a)(3) the Fiduciary Defendants must disgorge to the Plan all such money or the product thereof that is traceable to the prohibited transactions as well as any profits made thereon.

## Second Claim for Relief

Prohibited Transactions with Parties in Interest, ERISA § 406(a)
Pursuant to ERISA § 502(a)(2) and (a)(3)
The Fiduciary Defendants

98.     Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

20

99.     ERISA § 406(a)(1) prohibits ERISA fiduciaries from causing plans to engage in certain specified transactions with parties in interest.

100.    Pursuant to ERISA § 3(14)(A), (B), (C) & (G), United of Omaha was a party in interest with respect to the Plan because it was a fiduciary for the Plan, because it was a person providing services to the Plan, because it was an employer whose employees were covered by the Plan, and because it was a corporation of which 50 percent or more of the combined voting power of all classes of its stock entitled to vote or the total value of shares of all classes of its stock were owned directly or indirectly by Mutual of Omaha.

101.    Defendant Mutual of Omaha caused the Plan to engage in numerous transactions prohibited by ERISA § 406(a)(1)(C) & (D) by engaging in transactions with United of Omaha, including:

a.  United of Omaha furnished services to the Plan by "reinvesting" Plan assets in funds offered by third parties as an investment manager for the United of Omaha-branded funds, by providing other investment management services related to the non-United of Omaha branded funds, the Mutual Glidepath funds and the Mutual Directions funds and, under the GAC, by acting as an investment manager of amounts invested in the Guaranteed Account, for which it charged the Plan on an ongoing, periodic basis; and

b.  Plan assets were repeatedly transferred to United of Omaha when Plan participants selected United of Omaha-branded funds, when United of Omaha charged markups on non-proprietary funds, when it did so on the Mutual GlidePath Funds, the Mutual Directions Funds, and when United of Omaha paid itself the spread from the Guaranteed Account.

102.     The Fiduciary Defendants were aware that the counterparty to these transactions was its subsidiary, United of Omaha, and was aware that United of Omaha was a party in interest as that term is used in ERISA.

103.     Through these prohibited transactions, Mutual of Omaha received significant compensation by virtue of the profits earned by its subsidiary, United of Omaha, including the spread between the rate of return on the general account in which the Guaranteed Account assets were invested and the crediting rate provided to participants, that was far in excess of United of Omaha's direct expense actually incurred.

104.     ERISA § 502(a)(2) permits plan participants, such as Plaintiff, to bring civil actions for "appropriate relief" under ERISA § 409.

105.     Under ERISA § 409(a), a fiduciary that violates any of ERISA's duties, including ERISA § 406(a)(1)(A), (C) & (D), must "make good" to the plan the losses to the plan resulting from its violations of ERISA § 406(a)(1)(A), (C) & (D), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

106.     Thus under ERISA §§ 502(a)(2) and 409(a) the Fiduciary Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 406(a)(1)(A), (C) & (D), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

107.     ERISA § 502(a)(3) permits a plan participant to bring a civil action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

108.     The Fiduciary Defendants violated the provisions of Title 1 of ERISA by causing the Plan to enter into these transactions with United of Omaha, a party in interest. The Fiduciary

22

Defendants have profited from these prohibited transactions alleged herein in an amount to be proven at trial, and are in possession of money that belongs in good conscience to the Plan. All such money that belongs in good conscience to the Plan is subject to a constructive trust in favor of the Plan, for which the Fiduciary Defendants serve as constructive trustees. As constructive trustees, under ERISA § 502(a)(3) the Fiduciary Defendants must disgorge to the Plan all such money or the product thereof that is traceable to the prohibited transactions as well as any profits made thereon.

### PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment as follows:

A.     Certify this action as a class action as stated herein and appoint Plaintiff as the representative of the Class and Plaintiff's counsel as Class Counsel pursuant to Federal Rule of Civil Procedure 23;

B.     Declare that the Fiduciary Defendants breached their fiduciary duties and engaged in prohibited transactions as set forth above;

C.     Enjoin the Fiduciary Defendants from further violations of their fiduciary responsibilities, obligations, and duties and from further engaging in transactions prohibited by ERISA;

D.     Order that the Fiduciary Defendants make good to the Plan the losses resulting from their serial breaches of fiduciary duty and prohibited transactions;

E.     Order that the Fiduciary Defendants disgorge any profits they have made through the misconduct set forth herein, and impose a constructive trust and/or equitable lien on any funds received by the Fiduciary Defendants in the course or as a result of the misconduct set forth herein as well as the traceable product of and profits from those fees held in constructive trust;

F.      Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the Plan;

G.      Order Defendants to pay prejudgment interest; and

H.      Award such other and further equitable and remedial relief as the Court deems equitable and just.

DATED this 25th day of January, 2018.

By:     *s/ Garrett W. Wotkyns*
        Garrett W. Wotkyns
        John J. Nestico *
        SCHNEIDER WALLACE COTTRELL
        KONECKY WOTKYNS LLP
        8501 N. Scottsdale Rd., Suite 270
        Scottsdale, Arizona  85253
        Telephone: (480) 315-3841
        Facsimile: (866) 505-8036
        gwotkyns@schneiderwallace.com
        jnestico@schneiderwallace.com

        Todd M. Schneider *
        Kyle G. Bates *
        James A. Bloom *
        SCHNEIDER WALLACE COTTRELL
        KONECKY WOTKYNS LLP
        2000 Powell Street, Suite 1400
        Emeryville, California 94608
        Telephone: (415) 421-7100
        Facsimile: (415) 421-7105
        tschneider@schneiderwallace.com
        kbates@schneiderwallace.com
        jbloom@schneiderwallace.com

        Todd S. Collins *
        Shanon J. Carson *
        Ellen T. Noteware *
        BERGER & MONTAGUE, P.C.
        1622 Locust Street
        Philadelphia, Pennsylvania 19103-6365
        Telephone: (215) 875-3000
        tcollins@bm.net
        scarson@bm.net
        enoteware@bm.net

*Attorneys for Plaintiff*

\*(Application for Admission to Practice
forthcoming)