# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TAMERA S. LECHNER, REGINA K. WHITE, and STEVEN D. GIFFORD individually, on behalf of the MUTUAL OF OMAHA 401(k) LONG-TERM SAVINGS PLAN and on behalf of a class of all those similarly situated, | ) ) ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. 8:18-cv-00022-JBZ-CRZ |
| v. | ) ) | |
| MUTUAL OF OMAHA INSURANCE COMPANY, UNITED OF OMAHA LIFE INSURANCE COMPANY and JOHN DOES 1-50, | ) ) ) ) ) | Hon. Joseph F. Bataillon Hon. Cheryl R. Zwart (Mag.) |
| *Defendants*. | ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT – ERISA

### PRELIMINARY STATEMENT

1.      Plaintiffs Tamera S. Lechner, Regina K. White and Steven D. Gifford, participants in the Mutual of Omaha 401(k) Long-Term Savings Plan (the "Plan"), bring this action on behalf of the Plan and as a class action on behalf of all similarly situated participants in and beneficiaries of the Plan. They bring this action under Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3).

2.      Mutual of Omaha Insurance Company ("Mutual of Omaha") is an insurance company incorporated under the laws of the State of Nebraska.

3.      Mutual of Omaha sponsors the Plan to provide retirement benefits to employees of

1

Mutual of Omaha and certain of its subsidiaries, including its wholly owned subsidiary, United of Omaha Life Insurance Company ("United of Omaha").

4.      Mutual of Omaha and its certain of its employees (Defendants here) are fiduciaries for the Plan, with responsibility for selecting the Plan's investment options and hiring the Plan's service providers.

5.      The Plan is an individual account, defined contribution pension plan covered by ERISA.

6.      The Plan is funded by a combination of salary reduction contributions by plan participants and employer matching contributions.

7.      Participants can direct the retirement savings in their Plan accounts into a variety of investment options.

8.      Participant accounts in the Plan are comprised of employee contributions, any employer contributions and any investment income from the investment options selected within the participant account, less fees and expenses. *See Evans v. Akers*, 534 F.3d 65, 70 (1st Cir. 2008) ("A defined contribution plan 'promises the participant the value of an individual account at retirement.' ... This value is a function of the employee's contributions, plus vested employer matching contributions and investment gains, minus investment losses and any allocable expenses.").

9.      Unlike traditional defined benefit pension plans, which obligate employers to pay a particular amount at retirement (benefits that are guaranteed by the Pension Benefit Guarantee Corporation), participants in defined contribution plans (like the Plan) get no more at retirement than they have in their accounts at that time.

10.     Like the fiduciaries of other defined contribution plans, the Plan's fiduciaries select the investment options into which participants can direct the money in their retirement accounts in the Plan.

11.     ERISA plan fiduciaries are required to select investment options for their plans prudently and loyally – that is, solely in the interests of the Plan and its participants. ERISA § 404(a), 29 U.S.C. § 1104(a).

12.     The assets of ERISA-covered retirement plans, including the Plan, must be held in trust, segregated from an employer's other assets. Under no circumstances may plan assets inure to the benefit of an employer that sponsors a plan. ERISA § 403(a) & (c), 29 U.S.C. § 1103(a) & (c).

13.     Here, as set forth in more detail below, Defendants, who were the Plan's fiduciaries, flagrantly and intentionally violated the duties of loyalty and prudence by selecting their own administrative and investment services for the Plan, not to benefit the Plan or its participants, but because of the fees and profits, as well as other benefits, that the Plan's use of these services would generate for Defendants.

14.     Through their self-dealing, Defendants caused the Plan to pay amounts more than necessary or appropriate for reimbursement of expenses that Defendants properly and actually incurred.  In addition, Defendants caused the Plan to pay more than comparable plans pay for similar services in the marketplace.

15.     In particular, Defendants, as the Plan's fiduciaries, caused the Plan to participate in "Separate Account K," through which all of the Plan's investments and most of the Plan's administrative services were provided.

16.     Through the Separate Account K, Defendants offered many commonly available

3

mutual funds as investment options for the Plan's participants. However, in addition to the ordinary investment management fees charged by the underlying fund managers, Defendants also charged significant additional fees (the "Markups") that other investors in those funds do not pay. Defendants also took for themselves the revenue sharing payments these mutual funds paid. Because all of the Plan's investment options were offered through the Separate Account K vehicle, every investment option in the Plan that participants could select for the retirement savings was laden with these additional Markups.

17.     Defendants performed no investment management services in exchange for the Markups they charged on the funds in the Separate Account K. Instead, all of the investment management functions were performed by the third party managers that managed the underlying funds. As the Defendants averred in their motion to dismiss, "none of the options offered under United's Separate Account K are managed by United."

18.     Defendants claimed, in the Motion to Dismiss, that in exchange for these fees, they provided (i) administrative services (commonly called "recordkeeping" in the marketplace) and (ii) "creating and monitoring a full menu of investment options" offered through the Separate Account K. Typically, in the marketplace, these services are provided together as "platform" services, and plans the size of the Plan pay far less for platform services than the Plan paid United of Omaha here.

19.     By causing the Plan to participate in the Separate Account K, Defendants thus yielded significant fees, and significant profits, at the direct expense of the Plan and its participants. These fees were far above the expenses that Defendants properly and actually incurred and far above the rates that the Plan and its participants would have paid for comparable services in the marketplace.

20.     In addition to the Separate Account K, Defendants, as the Plan's fiduciaries, elected to include in the Plan a capital preservation option called the Guaranteed Account, which was managed by United of Omaha. Defendants included the Guaranteed Account despite scores of other better capital preservation funds on the market, simply because the Guaranteed Account paid significant fees and provided hefty profits to United of Omaha which, once again, far exceeded Defendants' direct expenses actually incurred.

21.     The Plan's fiduciaries, who are the Defendants in this case, thus used their position of trust over the Plan to line their own pockets at the expense of the Plan and its participants, larding the Plan with excessive, unreasonable and unnecessary fees that diminished the assets in the participants' retirement accounts. As noted above, Congress expressly forbids the use of plan assets for the benefit of an employer, and forbids plan fiduciaries from self-dealing with plan assets generally. In addition, the Department of Labor has addressed precisely the circumstances here in ERISA Opinion Letter 2001-10A  (Dec. 14, 2001) and determined that if a fiduciary provides services to its own plan and charges the plan fees that exceed the direct expenses that the fiduciary incurs in the provision of those services, it would engage in violations of ERISA section 406(b)(1) (dealing with the assets of the plan for its own benefit or its own account), and 406(b)(2) (acting in a transaction involving a plan on behalf of or representing a party whose interest are adverse to the plan).

22.     Plaintiffs seek damages and equitable relief on behalf of the Plan.

### THE PARTIES AND THE PLAN

23.     The Mutual of Omaha 401(k) Long-Term Savings Plan (the "Plan") is a participant-directed, individual account, defined contribution retirement savings plan covered by ERISA within the meaning of ERISA § 3(2) and (34), 29 U.S.C. § 1002(2) and (34).

24.     Plaintiff Tamera S. Lechner is a participant in the Plan. Through the Plan, Lechner invested in the Mid Cap Stock Index Fund, the Royce Total Return Fund, the Mutual Direction 5 Fund, the International Developed Countries Fund, the International Stock Index Fund, and the Wells Fargo Advantage Emerging Markets Fund. Lechner is a citizen and resident of Arizona.

25.     Plaintiff Regina K. White is a participant in the Plan. Through the Plan, White invested in the Mutual Directions 3 – Moderate fund and the Guaranteed Account. White is a citizen and resident of Nebraska.

26.     Plaintiff Steven D. Gifford is a current or former participant in the Plan. Through the Plan, Gifford invested in the Mutual Directions 4 and Mutual Directions 5 funds as well as the Guaranteed Account. Gifford is a citizen and resident of Kentucky.

27.     Defendant Mutual of Omaha is a Nebraska insurance company with its principal place of business in Omaha, Nebraska. Mutual of Omaha is the sponsor of the Plan. On information and belief, Mutual of Omaha was the Plan's named fiduciary and exercised authority or *de facto* control over selecting the Plan's investments, selecting the Plan's investment managers, deciding that the Plan would retain United of Omaha as an investment manager and service provider, or otherwise deciding that the Plan would pay fees to United of Omaha.

28.     Defendant United of Omaha is a Nebraska insurance company with its principal place of business in Omaha, Nebraska. United of Omaha is a wholly owned subsidiary of Mutual of Omaha. On information and belief, United of Omaha exercised authority or *de facto* control over selecting the Plan's investments, selecting the Plan's investment managers, deciding that the Plan would retain United of Omaha as an investment manager and service provider, or otherwise deciding that the Plan would pay fees to United of Omaha.

29.    Defendants John Does 1-50 are any employees of Mutual of Omaha or United of Omaha, including without limitation the members of Mutual of Omaha's Retirement Plans Administrative Committee, who exercised any authority or *de facto* control over selecting the Plan's investments, selecting the Plan's investment managers, deciding that the Plan would retain United of Omaha as an investment manager and service provider, or otherwise deciding that the Plan would pay fees to United of Omaha. Plaintiffs have been unable to identify the individuals named as John Does 1-50. Plaintiffs will endeavor to identify those individuals and entities in discovery and will seek leave to amend the complaint to name them once their identities have been ascertained.

30.    The "Fiduciary Defendants" include Mutual of Omaha, United of Omaha and Defendants John Does 1-50 to the extent that they exercised any authority or *de facto* control over selecting the Plan's investments, selecting the Plan's investment managers, deciding that the Plan would retain United of Omaha as an investment manager and service provider, or otherwise deciding that the Plan would pay fees to United of Omaha.

### JURISDICTION AND VENUE

31.    Plaintiffs bring this action pursuant to ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3).

32.    This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

33.    Venue lies in the District of Nebraska pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) and 28 U.S.C. §§ 1391(b) and (c), because Mutual of Omaha and United of Omaha

reside within or may be found in this district, the Plan is administered in this district, and/or the alleged breaches of the duties imposed by ERISA took place in this district.

34.     The Court has general personal jurisdiction over Defendants Mutual of Omaha and United of Omaha because they are organized under Nebraska law and/or have their principal places of business within this district. On information and belief, John Does 1-50 are citizens and residents of Nebraska.

35.     The Court has specific personal jurisdiction over the Fiduciary Defendants because they provided services for the Plan in this district and engaged in the conduct described herein which took place in and was specifically directed towards this district.

## DEFENDANTS' FIDUCIARY SELF-DEALING

36.     The Plan, as is typical of many defined contribution retirement plans, designates a number of mutual funds, separate accounts or other collective investment funds as "designated investment alternatives" and gives individual Plan participants the ability to choose how their Plan accounts will be invested by allocating their accounts among the designated investment alternatives.

37.     Fiduciaries for a retirement plan owe the plan and its participants and beneficiaries duties described as among the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982); *Braden v. Walmart Stores, Inc.*, 588 F.3d 585, 602 (8th Cir. 2009).

38.     When choosing investment options and service providers for a Plan, an ERISA plan fiduciary is required loyally and prudently. ERISA § 404(a)(1), 29 U.S.C. 1104(a)(1). The duty of loyalty requires the plan's fiduciary to act solely in the interest of the plan and its participants. The duty of prudence requires the plan's fiduciary to act with the care, skill, prudence and diligence

that would be exercised by someone who is experienced and knowledgeable about the services to be provided: a prudent expert, in other words.

39.     Specifically with respect to the fundamental fiduciary obligation of loyalty, ERISA prohibits a plan fiduciary from: (i) dealing with the assets of the plan for its own benefit or for its own account; (ii) representing a party or acting in a transaction on behalf of a party whose interests are adverse to the interests of the plan or its participants; and (iii) receiving for its own account any consideration from a party dealing with such plan in a transaction involving plan assets. ERISA § 406(b), 29 U.S.C. § 1106(b).

40.     These fiduciary duties are especially important in the context of fees paid by defined contribution plan participants, as the fees reduce, dollar for dollar (and more, when compounded), the amount of benefits participants will receive at retirement.

41.     As the Supreme Court explained in 2015, in defined contribution plans, employees' benefits at retirement "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

42.     Thus, over time, even small differences in fees and performance compound and can result in vast differences in the amount of savings available at retirement; "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

43.     In the context of individual account defined contribution plans, additional fees of only 0.18% (eighteen hundredths of one percent, or 18 basis points) can have a large detrimental effect on investment results over time, because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the

9

portion of their investment spent on unnecessary fees would have earned over time." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1190 (9th Cir. 2016) (*en banc*).

44.     Under the Plan, the Fiduciary Defendants had ultimate discretionary responsibility for the investment options made available to participants in the Plan as well as over the service providers that would provide services to the Plan and its participants.

45.     Instead of exercising that discretion solely in the best interests of the Plan and its participants as required by ERISA, the Fiduciary Defendants entered into the Separate Account K with Mutual of Omaha's subsidiary United of Omaha, for the purpose of lining the pockets of Mutual of Omaha at the expense of the Plan and its participants.

46.     Defendants thereby violated ERISA's duties of loyalty and prudence (29 U.S.C. § 1104(a)(1) and prohibition against fiduciary self-dealing (29 U.S.C. § 1106(b)(1)), by causing the Plan to pay United of Omaha significant fees for its own investment and administrative services far in excess of the cost to United of Omaha for providing those services and far in excess of any reasonable market rate for those services.

47.     Defendants' actions in causing the Plan and its participants to use Defendants' own investment and administrative services were not taken solely in the best interests of the Plan and its participants, and the Plan and its participants paid excessive fees for those services. Requiring the Plan and its participants to use Defendants' own investment and administrative services permitted Defendants to extract significant unreasonable and unnecessary fees and profits from the Plan and provided other benefits to Defendants, at the direct expense of the Plan and its participants.

48.     "The duty of loyalty 'requires that fiduciaries keep the interests of beneficiaries foremost in their minds, taking all steps necessary to prevent conflicting interests from entering

into the decision-making process.' In other words, conflicts of interest must be shunned." *Perez v. Bruister*, 823 F.3d 250, 261 (5th Cir. 2016) (citations omitted).

49.     There can be no doubt that Defendants faced a sharp conflict of interest in selecting administrative and investment services for the Plan. Defendants had the power, as the Plan's fiduciaries, to select their own services (and benefit themselves), or investigate whether comparable or better services might be available on the market from another provider, and if so, choose that provider.

50.     Faced with conflicts of interest where fiduciary loyalties can be challenged, courts, including the Eighth Circuit, shift the burden to the conflicted fiduciary to show that their actions nevertheless satisfied their fiduciary duties. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 602 (8th Cir. 2009) ("[T]he burden of proof is always on the party to the self-dealing transaction to justify its fairness.") (quoting *Marshall v. Snyder,* 572 F.2d 894, 900 (2d Cir. 1978)).

51.     When a fiduciary exercises its fiduciary responsibilities despite a conflict of interest, "courts should look closely at whether the fiduciaries investigated alternative actions and relied on outside advisors before implementing a challenged transaction." *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992); *see also Leigh v. Engle*, 727 F.2d 113, 125–26 (7th Cir. 1984) ("Where it might be possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries.").

52.     Based on the previously non-public documents Defendants attached to their motion to dismiss, it is now evident that Defendants caused the Plan to invest in Separate Account K and incur the significant Markups paid to United of Omaha, as well as the Guaranteed Account, despite the ready availability of comparable or better services that were significantly less expensive and/or

better performing. On information and belief, discovery will confirm Defendants' disloyalty by a complete absence of any effort to obtain a good deal for the Plan or even to investigate whether comparable or better services might be available at lower prices in the market.

53.     For example, on information and belief, Defendants never undertook any sort of request for proposal for administrative or investment services, never retained an independent consultant to evaluate whether comparable or better administrative or investment services might be available for less money from other providers, and never took any other steps to compare the cost and benefit of administrative or investment services from other providers—or, to the extent Defendants undertook any of these steps, they failed to do so in a loyal and prudent manner and/or failed to implement the results of investigation.

54.     Nor, on information and belief, did Defendants, the Plan's fiduciaries, retain an independent fiduciary or seek guidance from a court[1] when faced with the conflict of interest between selecting Defendants' own services or selecting comparable or better services provided by unrelated providers for less money. Instead, Defendants simply caused the Plan to purchase Defendants own services, even though the Plan paid Defendants far more than the amount of expenses fairly and actually incurred in providing those services, and far more than a reasonable market rate for those services compared to other plans of the same size. Thus Defendants failed to act "with an eye single to the interests of the participants and beneficiaries." *Perez*, 823 F.3d at 262.

### *Separate Account K and the Investment Fee Markups*

55.     The relative cost of providing recordkeeping and investment services to defined

---

[1] *E.g.*, *Central Trust Co., N.A. v. American Avents Corp.*, 771 F. Supp. 871, 872-73 (S.D. Ohio 1989) (fiduciary faced with conflict of interest sought and obtained declaratory judgment as to appropriate course of action).

contribution plans drops as the number of participants rises. These cost savings are due, in large part, to economies of scale. Large plans typically use these economies of scale to obtain recordkeeping and investment services at steep discounts compared to small plans.

56.     According to a 2015 study by the consulting firm NEPC, "Large plans tend to have lower expense ratios than smaller plans because they enjoy economies of scale stemming from their more substantial asset bases. Large plans also tend to have lower recordkeeping and/or revenue-sharing requirements per participant." NEPC 2015 Defined Contribution Plan & Fee Survey (the "NEPC Report").

57.     In 2016 the Plan had 6,099 participants[2] at the end of the plan year and $772 million in total assets. That put the Plan in the top 0.1% of 401(k) plans nationwide in terms of both number of participants and amount of assets, according to a study of 401(k) plans prepared by the Investment Company Institute and Brightscope:

---

[2] Much of the data cited herein comes from the Form 5500 annual reports that the Department of Labor requires all plans to file. The Form 5500s require plans to calculate the number of participants in a number of different ways. For the sake of simplicity, Plaintiff uses the number of participants with an account balance from line 6(g) of the standard Form 5500 and line 5(c) from the Short Form 5500.

| Plan assets | Plans | |
|---|---|---|
| | *Number* | *Percent* |
| Less than $1M | 317,480 | 58.1% |
| $1M to $10M | 198,874 | 36.4 |
| >$10M to $50M | 23,310 | 4.3 |
| >$50M to $100M | 3,032 | 0.6 |
| >$100M to $250M | 2,179 | 0.4 |
| >$250M to $500M | 867 | 0.2 |
| >$500M to $1B | 515 | 0.1 |
| More than $1B | 568 | 0.1 |
| All plans | 546,825 | 100.0 |

| Number of plan participants | Plans | |
|---|---|---|
| | *Number* | *Percent* |
| Fewer than 100 | 491,245 | 89.8% |
| 100 to 499 | 42,522 | 7.8 |
| 500 to 999 | 6,035 | 1.1 |
| 1,000 to 4,999 | 5,459 | 1.0 |
| 5,000 to 9,999 | 772 | 0.1 |
| 10,000 or more | 792 | 0.1 |
| All plans | 546,825 | 100.0 |

The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2015.

58.     According to the BrightScope/ICI study, for 401(k) plans with assets comparable to the Plan, the 10th percentile average total cost *of all services* (called "Total Plan Cost") in 2015 was 14 bps, the median was 27 bps, and the 90th percentile 51 bps.

59.     The total cost of the Plan was about $2.9 million per year, excluding the spread from the General Account (*see infra* at ¶ 78).[3] Based on a comparison between that total plan cost and $610 million in Plan assets outside the Guaranteed Account, that amounts to a Total Plan Cost for the Plan of 49 bps—far higher than the median and close to the 90th percentile in terms of fees.

---

[3] This figure credits Defendants' claim in their motion to dismiss that they credited back a portion of the Markups between 2012 and 2017. This also assumes that Defendants actually used the Markups to pay any portion of the Plans' recordkeeping expenses.

60.     Thus, despite the fact that Defendants are financial services companies part of whose core business is selling retirement plan investment products across the country and thus should certainly know better, the Plan was more expensive than almost 90% of comparably sized 401(k) plans, and all of those costs were paid by the Plan's participants.

61.     If the Guaranteed Account and its spread are taken into account, and assuming the spread was close to 2%, the Total Plan Cost was roughly 81 bps, far more expensive than even the 90th percentile for comparable Plans.

62.     In addition, the NEPC Report notes that the average per participant cost of recordkeeping services for plans comparable to the Plan (which includes all of the "services" that United of Omaha claims to have provided to the Plan) was $64 per participant. NEPC Report at 2.

63.     Each year, the Plan paid, roughly, the following:

   a.  $1.7 million to the outside investment managers of the funds (of which approximately $100,000 per year was kicked back to Defendants in the form of revenue sharing payments);

   b.  $1.2 million in Markups to Defendants (again, those Markups are fees in addition to the fees paid to the entities that actually managed the underlying assets); and

   c.  $3.2 million in spread on the Guaranteed Account to Defendants.

64.     The $1.3 million paid to Defendants each year (excluding the Guaranteed Account), works out roughly to $195 per participant per year. The Plan accordingly paid Defendants ***three times*** what the average plan paid ($64) for comparable services on a per participant basis, according to the NEPC Report.

65.     Notably, despite charging the Plan more than $1.3 million per year for, Defendants claim, recordkeeping services (among other things), Defendants hired a subcontractor (a company

15

called Ascensus), which provided recordkeeping services to the Plan in 2016 for $120,000— roughly $20 per participant.

66.     Whether the market rate for recordkeeping and platform services is worth $64 per participant (according to NEPC) or the $20 the Plan paid Ascensus in 2016, does not need to be resolved on the pleadings without the benefit of expert testimony. The $195 per participant the Plan actually paid Defendants is far beyond any reasonable market rate. Moreover, the amount the Plan actually paid Defendants is far beyond the expenses that Defendants properly and actually incurred in providing services to the Plan.

67.     Based on the list of plans identified by Defendants on the Form 5500 for the Separate Account K that Defendants filed with the Department of Labor (and which Defendants attached to their Motion to Dismiss, ECF No. 32-12), there were, roughly, 3,500 plans in Separate Account K. Three of these (including the Plan) were sponsored by Mutual of Omaha.

68.     However, the Plan was far larger than the other plans that participated in Separate Account K, both in terms of the number of participants and the amount of assets.

    a.  As noted, in 2016, at the end of the Plan year, the Plan had 6,099 participants at the end of the plan year and $772 million in total assets.

    b.  Excluding the Mutual of Omaha sponsored plans, the next largest plan in Separate Account K[4] had only 3,095 participants—fewer than half as many as the Plan—and only $44 million in total assets, far less than the Plan's $772 million.

    c.  The remaining plans in Separate Account K had, on average, fewer than 50 participants and less than $2 million in total assets in 2016.

---

[4] The Imagine Schools, Inc. 401(k) Retirement Savings Plan.

d.  Apart from the Mutual of Omaha Plans, only five other plans in Separate Account K had as many as 1,000 participants.

69.     Moreover, a large percentage of the assets in Separate Account K came from the Plan and other retirement plans sponsored by Mutual of Omaha.

a.  Separate Account K listed just over $3 billion in assets at year-end 2016.

b.  At year-end 2016, the Plan had at least roughly $600 million invested in Separate Account K.

c.  In addition, the Mutual of Omaha Retirement Income Plan, a defined benefit pension plan sponsored by Mutual of Omaha, had at least $56 million invested in Separate Account K.

d.  The Mutual of Omaha Bank 401(k) Plan had at least $50 million invested in Separate Account K.

e.  Thus, at least $700 million of the $3 billion total assets in Separate Account K (23% of the total) were coming from plans sponsored by Mutual of Omaha itself, in which Defendants made the investment decisions.

70.     The Plan's investment in Separate Account K thus provided additional benefits to Defendants on top of the millions of dollars of fees. Because Defendants controlled the investment decisions for the Plan (and the other Mutual of Omaha plans noted above), Defendants could ensure that these plans kept large amounts of money in Separate Account K, providing a foundation of stability in long term deposit amounts. Defendants thus used the money from the Plan in Separate Account K to support its business operations targeted to smaller plans unaffiliated with Defendants by greatly increasing (from the perspective of the small plan customers) the amount in the Pool.

71.    While pooling money for investments may provide benefits in terms of lower fees to small plans, such as made up the remainder of the Separate Account K that did not come from the Plan and the other Mutual of Omaha plans noted above, it had the opposite effect on the Plan. As noted above, the Plan's total costs, administrative fees and average investment fees were much higher than average for a plan the size of the Plan.

72.    Moreover, in addition to the Markups described above that United of Omaha added to the investment fees associated with the funds offered through Separate Account K, United of Omaha failed to obtain reduced "institutional" level investment fees that plans the size of the Plan ordinarily pay (and for which the Plan alone qualified as a very large institutional investor). For example:

   a.  Each of the Mutual GlidePath Funds in the Plan offers to qualified plans, like the Plan a share class with total annual expenses of 0.33%. The Plan, however, invested in a share class that charged 0.51%. United of Omaha added a Markup of 0.35%, meaning that participants paid 0.88% when they could have paid 0.32% for exactly the same fund.

   b.  The John Hancock Disciplined Value Mid Cap Fund offers to qualified plans, like the Plan a share class with total annual expenses of 0.77%. The Plan, however, invested in a share class that charged 0.86%. In addition, United of Omaha added a Markup of 0.25%, meaning that participants paid 1.11% when they could have paid only 0.77% for exactly the same fund.

   c.  The T Rowe Price Growth Stock Fund offers to qualified plans, like the Plan a share class with total annual expenses of 0.52%. The Plan, however, invested in a share class taht charged 0.67%. In addition, United of Omaha added a Markup of 0.20%,

meaning that participants paid 0.87% when they could have paid 0.52% for exactly the same fund.

d. The Wells Fargo Adv Emerging Markets Equity Fund offers to qualified plans, like the Plan a share class with total annual expenses of 1.13%. The Plan, however, invested in a share class that charged 1.22%. United of Omaha added a Markup of 0.21%, meaning that participants paid 1.43% when they could have paid 1.13% for exactly the same fund.

73.    The total fees and expenses United of Omaha and Mutual of Omaha received from the Markups on the Plan's investment options, and the spread on the Guaranteed Account, greatly exceeded any costs Defendants properly and actually incurred in maintaining or administering the Plan.  A significant portion of those fees represented illegal profit at the expense of the Plan and its participants.

74.    Thus, instead of using the negotiating power conferred by the Plan's size, the Fiduciary Defendants simply caused the Plan to buy United of Omaha's overpriced services—violating ERISA's duty of loyalty and permitting Plan assets to inure to the benefit of United of Omaha and Mutual of Omaha.

75.    Notably, Defendants, in their Motion to Dismiss, imply that Ascensus was paid out of the fees paid to United of Omaha. However, the Plan's Form 5500 Annual Reports suggest that Ascensus was paid separately by the Plan. On information and belief, the payments to Ascensus were separate and apart from, and in addition to, the Markups paid to United of Omaha. While the numbers quoted above assume that Defendants' themselves paid Ascensus from the Markups, if discovery shows the Plan itself paid Ascensus, Defendants' misconduct would be even more stark.

### *The Guaranteed Account*

76.     In addition to the misconduct described above, the Fiduciary Defendants also caused the Plan to offer the Guaranteed Account by entering into a group annuity contract (the "GAC") with United of Omaha.

77.     Under the GAC, United of Omaha takes the assets contributed to Plan participants' accounts that are directed by participants to be invested in the Guaranteed Account (the "principal amount"), and deposits them in its general account, to be invested along with all the other assets in United of Omaha's general account. Each month, United of Omaha selects a "crediting interest rate," which United of Omaha applies to the assets contributed that month for five years or until the assets are withdrawn. United can set the rates as low as zero percent (0%).  Contributions to the contract during any month will receive the guaranteed interest rate for that month for five years. The actual earnings of the general account invariably exceed the crediting interest rate.

78.     United of Omaha keeps the difference between the actual earnings on the amounts Plan participants contributed and the crediting interest rate, which is called the "spread."

79.     From the spread, United of Omaha reimburses all of its own costs for providing the Guaranteed Account, charges investment and administrative fees and makes a significant profit.

80.     The GAC effectively enables United of Omaha to determine how much interest it will credit, thus giving United of Omaha (or United of Omaha together with Mutual of Omaha) complete control over how much of the yield from the Guaranteed Account would inure to the benefit of the Plans and how much United of Omaha would keep for its own benefit. United of Omaha used its discretionary control over the interest rate to increase its own compensation rather than crediting the participants of the Plan with appropriate returns.

81.     United of Omaha does not disclose the amount of the spread or the return on the underlying assets that back the Guaranteed Account. On information and belief, for several years leading up to the filing of this Complaint, the spread has been larger than the crediting interest rate – meaning that United of Omaha has kept more of the investment returns on the underlying assets than it pays to the investors (in this case, the participants in the Plan).

82.     Moreover, the spread retained by United of Omaha vastly exceeds any costs it incurs in managing and offering the Guaranteed Account.

83.     Because United of Omaha is a wholly owned subsidiary of Mutual of Omaha, that profit ultimately inures to the benefit of Mutual of Omaha.

84.     Because the Plan is a defined contribution Plan, the profits retained by United of Omaha directly reduce the benefits Plan participants, such as Plaintiff, are entitled to receive at retirement.

85.     Moreover, there are numerous capital preservation retirement investment options besides the Guaranteed Account available on the market from other investment providers with higher crediting rates (that is, that pay more to retirement plan participant investors).

86.     Defendants reported that the Guaranteed Account yielded the following average returns:

| Year | Return |
|------|--------|
| 2017 | 1.56% |
| 2016 | 1.53% |
| 2015 | 1.66% |
| 2014 | 1.99% |
| 2013 | 2.33% |
| 2012 | 2.80% |
| 2011 | 3.69% |
| 2010 | 3.58%* |
| 2009 | 4.34% |

*\* Plaintiffs do not have annual performance data for this, but have derived this number from multi-year performance data reported by Defendants in 2012.*

87.     By contrast, the average returns of the comparable insurance company capital preservation products were much higher, according to the Stable Value Investment Association:

| Year | United of Omaha GA Return | SVIA Ins. Co. Stable Value |
|------|------|------|
| 2017 | 1.56% | |
| 2016 | 1.53% | 2.89% |
| 2015 | 1.66% | 3.1% |
| 2014 | 1.99% | 2.84% |
| 2013 | 2.33% | 2.88% |
| 2012 | 2.80% | 2.82% |
| 2011 | 3.69% | 3.15% |
| 2010 | 3.58%* | 3.93% |

88.     The Fiduciary Defendants could have included one or more of those products included in the SVIA average in lieu of the Guaranteed Account.

89.     One example of a product the Fiduciary Defendants could have offered instead of the United of Omaha Guaranteed Account was the MassMutual Guaranteed Interest Account, whose performance compared to the Guaranteed Account is as follows:

| Year | United of Omaha General Account Return | MassMutual GIC |
|------|------|------|
| 2017 | 1.56% | 2.64% |
| 2016 | 1.53% | 2.76% |
| 2015 | 1.66% | 3.47% |
| 2014 | 1.99% | 3.39% |
| 2013 | 2.33% | 3.38% |
| 2012 | 2.80% | 3.45% |
| 2011 | 3.69% | 3.85% |
| 2010 | 3.58%* | 3.36% |
| 2009 | 4.34% | 3.63% |

90.     The Fiduciary Defendants were well aware of the conflict of interest between Mutual of Omaha and the Plan's participants when they chose to include the Guaranteed Account as an investment option in the Plan. But they did so anyway in order to provide for the profits United of Omaha would and did generate—which greatly exceeded the expenses that Defendants properly and actually incurred—from offering the Guaranteed Account to the Plan.

91.     The Fiduciary Defendants had numerous opportunities to remove the Guaranteed Account and replace it with a better performing option from another provider.

### *Defendants' Concealment of their Misconduct*

92.     Defendants concealed their self-dealing from Plan participants and never disclosed that they were greatly profiting from the inclusion of the funds at issue here in the Plan.

93.     None of the Fiduciary Defendants disclosed to the Plan's participants either (i) the amount or existence of the spread retained by United of Omaha with respect to the Guaranteed Account or (ii) the substantial and unjustified mark-ups to the expense of investing in the other available investment alternatives.

94.     Moreover, Mutual of Omaha provided official fee disclosures to the Plan's participants falsely representing that no fees or operating expenses were being charged against the Guaranteed Account when, in fact, United of Omaha was generating significant profits, fees and compensation for itself out of the spread. The fee disclosures provided to Plan participants did not disclose the existence or amount of the spread.

95.     Nor did the fee disclosures or statements provided to Plan participants disclose that United of Omaha was charging across the board Markups on every investment option in addition to the ordinary investment fees charged by the underlying fund managers.

96.     Thus, not only did the Fiduciary Defendants violate the most fundamental of fiduciary duties – the duty of loyalty – by including the entire range of proprietary funds so that Mutual of Omaha and United of Omaha could profit at the expense of the Plan's participants, but also the Fiduciary Defendants took great care to conceal from the Plan's participants (including Plaintiffs) the facts about the additional and excessive fees added to the Plan's investment choices.

### CLASS ACTION ALLEGATIONS

97.     Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(1) or, in the alternative, 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class of similarly situated persons ("the Class"):

> *All participants in and beneficiaries of the Plan, excluding the Fiduciary Defendants.*

98.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are, at a minimum, thousands of Class members.

99.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among such questions are:

   a.   Whether the Fiduciary Defendants breached their fiduciary duties of loyalty and/or dealt with the assets of the Plan in their own interest in violation of ERISA §§ 404(a) and 406(b)(1), 29 U.S.C. §§ 1104(a) and 1106(b)(1);

   b.   Whether the Fiduciary Defendants caused the Plan to engage in transactions prohibited by ERISA § 406(a), 29 U.S.C. § 1106(a).

100.    There are no substantial individual questions among the Class claims on the merits of this action, and Plaintiffs are not aware of any conflicts between herself and members of the putative Class.

101.    Plaintiffs' claims are typical of the claims of the members of the proposed Class, as Plaintiff and all other members of the putative Class were harmed by the Fiduciary Defendants' wrongful conduct. Plaintiffs are aggrieved by the prohibited transactions and breaches of fiduciary duties she and all other members of the Class have suffered at the Fiduciary Defendants' hands and is intent on seeing such wrongs remedied. Neither Plaintiffs nor her counsel have any interests that might cause them to refrain from vigorously pursuing the claims in this class action. Thus, Plaintiffs are adequate representatives of the Class.

102.    Class certification of Plaintiffs' Claims for Relief is appropriate under Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the Fiduciary Defendants, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

103.    In the alternative, class certification of Plaintiffs' Claims for Relief also is appropriate under Fed. R. Civ. P. 23(b)(3) because common issues of law and fact predominate over questions affecting only individual members of the Class. The only individualized issues here will be the amount of damage each member of the Class incurred from the Fiduciary Defendants' breaches of fiduciary duty and prohibited transactions, and such damages can be readily calculated based on business records maintained by the Fiduciary Defendants. Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The

Fiduciary Defendants have obtained wrongful profits through overcharges that are, on an individual level, small and difficult to detect but in the aggregate are an enormous drain on Class members' retirement assets. Individual participants in the Plan who have invested in the funds at issue here have an insufficient stake in the outcome of this matter to devote the substantial resources that would be required to pursue this action on an individual basis.

104.    On information and belief, the Class is easily ascertainable because the names and addresses of the Class members are available from the Fiduciary Defendants, and adequate notice can be provided to members of the Class to the extent required by Fed. R. Civ. P. 23.

105.    Plaintiffs are committed to fairly, adequately, and vigorously representing and protecting the interests of the members of the Class, and have retained counsel competent and experienced in class action litigation of this nature for this purpose. Thus, the requirements of Rule 23(g) are met.

### CLAIMS

### First Claim for Relief

Breach of ERISA Fiduciary Duties of Loyalty and Prudence, ERISA § 404(a)(1), 29 U.S.C.
§ 1104(a)(1)
Self-Dealing Prohibited Transactions, ERISA § 406(b), 29 U.S.C. § 1106(b)
Pursuant to ERISA § 502(a)(2) and (a)(3), 29 U.S.C. § 1132(a)(2) and (a)(3)
The Fiduciary Defendants

106.    Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

107.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1) requires ERISA plan fiduciaries to perform their fiduciary duties and responsibilities (i) solely in the best interests of Plan participants for the exclusive purpose of providing them benefits under the Plan, and (ii) with the care, skill, prudence and diligence under the circumstances then prevailing that prudent person, familiar with such matters, would exercise.

108.    Similarly, ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1) prohibits a fiduciary from dealing with the assets of a plan in its own interest or for its own account.

109.    The Fiduciary Defendants breached their duties of loyalty and prudence under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) and dealt with the assets of the Plan in its own interest and for its own account in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1). The Fiduciary Defendants' disloyal and self-dealing acts are set forth in more detail above, and include, but are not limited to, the following:

a.    Causing the Plan to participate in Separate Account K because of the Markups that United of Omaha added to the investment fees of the investment options made available to the Plan through Separate Account K;

b.    including and failing to remove the Guaranteed Account as an investment option despite the availability of better performing, lower cost capital preservation options in the marketplace; and

c.    controlling both sides of the crediting rate on the Guaranteed Account with its subsidiary, United of Omaha, regarding the terms of the underlying investment contract to maximize profits for itself and United of Omaha at the expense of Plan participants.

110.    Mutual of Omaha received significant revenues from its wholly owned subsidiary United of Omaha arising out of this course of self-dealing.

111.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) permits plan participants, such as Plaintiffs, to bring civil actions for "appropriate relief" under ERISA § 409, 29 U.S.C. § 1109.

112.    Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties, including ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) and ERISA

§ 406(b)(1), 29 U.S.C. § 1106(b)(1), must "make good" to the plan the losses to the plan resulting from its violations of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) and ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

113.   Thus under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), the Fiduciary Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) and ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

114.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring a civil action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

115.   The Fiduciary Defendants' disloyal conduct and self-dealing violated the provisions of Title 1 of ERISA. The Fiduciary Defendants have profited from the fiduciary violations alleged herein in an amount to be proven at trial, and are in possession of money that belongs in good conscience to the Plan. All such money that belongs in good conscience to the Plan is subject to a constructive trust in favor of the Plan, for which the Fiduciary Defendants serve as constructive trustees. As constructive trustees, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Fiduciary Defendants must disgorge to the Plan all such money or the product thereof that is traceable to the prohibited transactions as well as any profits made thereon.

## Second Claim for Relief

Prohibited Transactions with Parties in Interest, ERISA § 406(a), 29 U.S.C. § 1106(a)
Pursuant to ERISA § 502(a)(2) and (a)(3), 29 U.S.C. § 1132(a)(2) and (a)(3)
The Fiduciary Defendants

116.     Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

117.     ERISA § 406(a)(1), 29 U.S.C. § 1106(a), prohibits ERISA fiduciaries from causing plans to engage in certain specified transactions with parties in interest.

118.     Pursuant to ERISA § 3(14)(A), (B), (C) & (G), 29 U.S.C. § 1002(14)(A), (B), (C) & (G), United of Omaha was a party in interest with respect to the Plan because it was a fiduciary for the Plan, because it was a person providing services to the Plan, because it was an employer whose employees were covered by the Plan, and because it was a corporation of which 50 percent or more of the combined voting power of all classes of its stock entitled to vote or the total value of shares of all classes of its stock were owned directly or indirectly by Mutual of Omaha.

119.     Defendant Mutual of Omaha caused the Plan to engage in numerous transactions prohibited by ERISA § 406(a)(1)(C) & (D), 29 U.S.C. § 1106(a)(1)(C) & (D), by engaging in transactions with United of Omaha, including:

a.   United of Omaha furnished services to the Plan through the Separate Account K and by acting as an investment manager of amounts invested in the Guaranteed Account, for which it charged the Plan on an ongoing, periodic basis; and

b.   Plan assets were repeatedly transferred to United of Omaha when United of Omaha retained the Markups from the funds held in the Separate Account K and when United of Omaha paid itself the spread from the Guaranteed Account.

120.     The Fiduciary Defendants were aware that the counterparty to these transactions was its subsidiary, United of Omaha, that United of Omaha received plan assets from the transactions, and were aware that United of Omaha was a party in interest as that term is used in ERISA.

121.    Through these prohibited transactions, Mutual of Omaha received significant compensation by virtue of the profits earned by its subsidiary, United of Omaha, including the spread between the rate of return on the general account in which the Guaranteed Account assets were invested and the crediting rate provided to participants, that was far in excess of United of Omaha's direct expense actually incurred.

122.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits plan participants, such as Plaintiffs, to bring civil actions for "appropriate relief" under ERISA § 409, 29 U.S.C. § 1109.

123.    Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties, including ERISA § 406(a)(1)(A), (C) & (D), 29 U.S.C. § 1106(a)(1)(C) & (D), must "make good" to the plan the losses to the plan resulting from its violations of ERISA § 406(a)(1)(A), (C) & (D), 29 U.S.C. § 1106(a)(1)(C) & (D), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

124.    Thus under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), the Fiduciary Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 406(a)(1)(A), (C) & (D), 29 U.S.C. § 1106(a)(1)(C) & (D), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

125.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring a civil action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

126.    The Fiduciary Defendants violated the provisions of Title 1 of ERISA by causing the Plan to enter into these transactions with United of Omaha, a party in interest. The Fiduciary Defendants have profited from these prohibited transactions alleged herein in an amount to be

proven at trial, and are in possession of money that belongs in good conscience to the Plan. All such money that belongs in good conscience to the Plan is subject to a constructive trust in favor of the Plan, for which the Fiduciary Defendants serve as constructive trustees. As constructive trustees, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Fiduciary Defendants must disgorge to the Plan all such money or the product thereof that is traceable to the prohibited transactions as well as any profits made thereon.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

A. Certify this action as a class action as stated herein and appoint Plaintiffs as the representatives of the Class and Plaintiffs' counsel as Class Counsel pursuant to Federal Rule of Civil Procedure 23;

B. Declare that the Fiduciary Defendants breached their fiduciary duties and engaged in prohibited transactions as set forth above;

C. Enjoin the Fiduciary Defendants from further violations of their fiduciary responsibilities, obligations, and duties and from further engaging in transactions prohibited by ERISA;

D. Order that the Fiduciary Defendants make good to the Plan the losses resulting from their serial breaches of fiduciary duty and prohibited transactions;

E. Order that the Fiduciary Defendants disgorge any profits they have made through the misconduct set forth herein, and impose a constructive trust and/or equitable lien on any funds received by the Fiduciary Defendants in the course or as a result of the misconduct set forth herein as well as the traceable product of and profits from those fees held in constructive trust;

F.      Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the Plan;

G.      Order Defendants to pay prejudgment interest; and

H.      Award such other and further equitable and remedial relief as the Court deems equitable and just.

DATED this 29th day of May, 2018.

By:      *s/ Garrett W. Wotkyns*
         Garrett W. Wotkyns
         John J. Nestico
         SCHNEIDER WALLACE COTTRELL
         KONECKY WOTKYNS LLP
         8501 N. Scottsdale Rd., Suite 270
         Scottsdale, Arizona  85253
         Telephone: (480) 315-3841
         Facsimile: (866) 505-8036
         gwotkyns@schneiderwallace.com
         jnestico@schneiderwallace.com

         Todd M. Schneider
         Kyle G. Bates
         James A. Bloom
         SCHNEIDER WALLACE COTTRELL
         KONECKY WOTKYNS LLP
         2000 Powell Street, Suite 1400
         Emeryville, California 94608
         Telephone: (415) 421-7100
         Facsimile: (415) 421-7105
         tschneider@schneiderwallace.com
         kbates@schneiderwallace.com
         jbloom@schneiderwallace.com

         Todd S. Collins
         Ellen T. Noteware
         BERGER & MONTAGUE, P.C.
         1622 Locust Street
         Philadelphia, Pennsylvania 19103-6365
         Telephone: (215) 875-3000
         tcollins@bm.net
         scarson@bm.net
         enoteware@bm.net

*Attorneys for Plaintiffs*