**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| TAMERA S. LECHNER, REGINA K. WHITE, and STEVEN D. GIFFORD individually, on behalf of the MUTUAL OF OMAHA 401(k) LONG-TERM SAVINGS PLAN and on behalf of a class of all those similarly situated, | ) ) ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. 8:18-cv-00022-JFB-CRZ |
| v. | ) ) | |
| MUTUAL OF OMAHA INSURANCE COMPANY, UNITED OF OMAHA LIFE INSURANCE COMPANY and JOHN DOES 1-50, | ) ) ) ) ) | Hon. Joseph F. Bataillon Hon. Cheryl R. Zwart (Mag.) |
| *Defendants*. | | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    FACTS ................................................................................................................ 4

       A.     The Parties and the Plan ................................................................................ 4

       B.     Defendants Enrolled the Plan in the Affiliated Separate Account K ..................... 5

       C.     Defendants Enrolled the Plan in the Affiliated Guaranteed Account ..................... 6

       D.     Defendants' Concealment of their Misconduct ................................................. 7

III.   LEGAL STANDARD ......................................................................................... 8

IV.    ARGUMENT ...................................................................................................... 9

       A.     Plaintiffs' Claims Are Timely ........................................................................ 9

       B.     Plaintiffs State a Claim for Breach of ERISA's Duty of Loyalty ...................... 11

              1.     Defendants' Disloyal Management of the Plan Was an Abuse of
                     Discretion ................................................................................... 12

              2.     Defendants' Affiliation with the Service Providers is "Relevant" to
                     Whether they Breached the Duty of Loyalty .......................................... 13

       C.     The AC Alleges that the Separate Account K Was More Expensive Than
              Comparable Services on the Market ............................................................... 15

              1.     United Provides Only Standard Recordkeeping and Platform Services
                     to the Plan, as it Admitted in the Original Motion to Dismiss ................. 16

              2.     The Plan Paid More than the Market Rate for United's Services ............. 17

              3.     United's Markups Caused the Plan to Pay Above Market Rates to
                     United .......................................................................................... 19

       D.     Defendants Breached their Fiduciary Duties by Including and Retaining the
              Guaranteed Account in the Plan ................................................................... 20

       E.     Defendants Make No Valid Argument to Dismiss the Disloyalty Claims ........... 24

V.     CONCLUSION .................................................................................................. 26

i

# TABLE OF AUTHORITIES

**Cases**

*Allen v. GreatBanc Trust Co.*,
 835 F.3d 670 (7th Cir. 2016) ..................................................... 8

*Ashcroft v. Iqbal*,
 556 U.S. 662, 678 (2009).......................................................... 8

*Braden v. Wal-Mart Stores, Inc.*,
 588 F.3d 585, 594, 595-596, 598 (8th Cir. 2009) ............................. *passim*

*Brotherston v. Putnam Invs., LLC*,
 2017 WL 2634361, (D. Mass. June 19, 2017) ................................... 25

*Cryer v. Franklin Templeton*,
 2017 WL 818788 (N.D. Cal.) ................................................. 12, 25

*Cunningham v. Cornell Univ.*,
 2017 WL 4358769, at *7 (S.D.N.Y. Sept. 29, 2017)............................. 23

*David v. Alphin*,
 704 F.3d 327, 340 (4th Cir. 2013) ............................................. 10

*Fifth Third Bancorp v. Dudenhoeffer*,
 134 S. Ct. 2459 (2014)........................................................ 23

*Harley v. Minn. Min. & Mfg. Co.*,
 284 F.3d 901 (8th Cir. 2002) ................................................... 2

*Hecker v. Deere & Co.*,
 569 F.3d 708, 711 (7th Cir. 2009) ............................................. 23

*Henderson v. Emory Univ.*,
 252 F. Supp. 3d 1344, 1349-53 1355 (N.D. Ga. 2017)...................... 11, 22

*In re McKesson HBOC, Inc. ERISA Litig.*,
 391 F. Supp. 2d 812, 835 (N.D. Cal. 2005) .................................... 25

*In re Target Corp. Sec. Litig.*,
 275 F. Supp. 3d 1063, 1090 (D. Minn. 2017).................................. 25

*Insinga v. United of Omaha Life Ins. Co.*,
 2017 WL 6884626 *4–5 (D. Neb. Oct. 26, 2017) ........................... 2, 21

*Kelly v. Johns Hopkins Univ.*,
  2017 WL 4310229, at *2 (D. Md. Sept. 28, 2017) ................................................. 23

*Kreuger v. Ameriprise*,
  2012 WL 5873825 (D. Minn) ............................................................................... 25

*Leigh v. Engle*,
  727 F.2d 113, 126 (7th Cir. 1984) ...................................................................... 10

*Lowen v. Tower Asset Mgmt.*,
  827 F.2d 1209, 1213 (2d Cir. 1987) ..................................................................... 10

*Main v. American Airlines*,
  248 F. Supp. 3d 786, 792-93 (N.D. Tex. 2017) ..................................................... 25

*Mass. Mut. Life Ins. Co. v. Russell*,
  473 U.S. 134, 140 n.8 (1985) ................................................................................ 8

*McDonald v. Jones*,
  2017 WL 372101, at *2 (E.D. Mo.) ............................................................ 12, 16, 25

*Meiners v. Wells Fargo*,
  2017 WL 2303964 (D. Minn. May 25, 2017) ........................................................ 13

*Moreno v. Deutsche Bank*, 2016 WL 5957307, *6 (S.D.N.Y.) .................................... 25

*Muri v. Nat'l Indem. Co.*,
  2018 WL 1054326, at *4 (D. Neb. Feb. 26, 2018) ................................... 3, 13, 22, 25

*Pegram v. Herdrich*,
  530 U.S. 211, 224 and 235 (2000) ......................................................................... 1

*Perez v. Chimes D.C., Inc.*,
  2016 WL 4993293, at *6 n.10 (D. Md. Sept. 19, 2016) ......................................... 10

*Pfeil v. State St. Bank & Tr. Co.*,
  671 F.3d 585, 597 (6th Cir. 2012) ...................................................................... 23

*Sacerdote v. New York Univ.*,
  2017 WL 3701482, at *8–9 (S.D.N.Y. Aug. 25, 2017) .......................................... 23

*Schaefer v. Arkansas Med. Soc.*,
  853 F.2d 1487, 1491 (8th Cir. 1988) ................................................................... 10

*Solis v. Bruister*,
  2012 WL 776028, at *2 (S.D. Miss. Mar. 8, 2012) ............................................... 10

iii

*Sweda v. University of Pennsylvania*,
   2017 WL 4179752 (E.D. Pa. Sept. 21, 2017),
   *appeal filed*, No. 17–3244 (3d Cir. Oct. 13, 2017) ................................................ 22

*Tibble v. Edison Int'l*,
   135 S. Ct. 1823, 1828 (2015) ..................................................................... 12

*Urakhchin v. Allianz*, 2016 WL 4507117 (C.D. Cal.)
   2016 WL 4507117 ................................................................................. 25

*Wildman v. American Century Services, LLC*,
   237 F. Supp. 3d 902, 909, 912-13, 914 (W.D. Mo. 2017) .............................. *passim*

## Statutes

29 U.S.C. § 1104(a)(1)(A) ........................................................................ 1, 11

29 U.S.C. § 1106(a)-(b) ................................................................................ 4

ERISA § 2(14) ............................................................................................ 4

ERISA § 404(a)(1)(A) ..................................................................... 1, 11, 14, 24

ERISA § 406 ....................................................................................... *passim*

ERISA § 406(a)(1)(C) ............................................................................... 7, 9

ERISA § 406(a)-(b) ...................................................................................... 4

ERISA § 406(b)(1) ............................................................................ 4, 14, 18

ERISA § 408(c) ...................................................................................... 2, 11

ERISA § 413(1) ..................................................................................... 10, 24

Restatement (Third) of Trusts § 87 (2007) ................................................... 12

## Other Authorities

DOL Advisory Opinion
   2011-06A (Feb. 4, 2011)............................................................................ 15

ERISA Opinion Letter
   89-09A (June 13, 1989) ........................................................................... 15

ERISA Opinion Letter
   97-19A (Aug. 28, 1997).......................................................................... 15

ERISA Opinion Letter
   2011-10A (Dec. 14, 2001) ....................................................................... 15

**Rules & Regulations**

29 C.F.R. § 2550.408b-2(e) and 2(e)(3) ...................................................................... 2, 9, 15, 18

29 C.F.R. § 2550.408c–2(a) ..................................................................................................... 2

29 C.F.R. § 2550.408c–2(b)(3) ............................................................................................... 15

56 Fed. Reg. 10,724, 10,730 (Mar. 13, 1991) ......................................................................... 14

77 Fed. Reg. 5632 (Feb. 3, 2012) ............................................................................................ 7

Fed. R. Civ. P. 8(a) ................................................................................................................... 8

## I.     __INTRODUCTION__

The Amended Complaint (the "AC") presents a straightforward case of improper fiduciary self-dealing that harmed Plaintiffs Tamera S. Lechner, Regina K. White and Steven D. Gifford ("Plaintiffs") and their ERISA plan. It is supported by detailed factual allegations.

Defendant Mutual of Omaha Insurance Company ("Mutual") sponsors the Mutual of Omaha 401(k) Long-Term Savings Plan (the "Plan"), for the benefit of its employees, including Plaintiffs. United of Omaha Insurance Company ("United"), Mutual's wholly owned subsidiary, provides services to qualified retirement plans through a contract called the Separate Account K.

Mutual misused its authority as the Plan's fiduciary to hire its subsidiary, United, invested the Plan's assets through Separate Account K, and chose the United-managed "Guaranteed Account" as an investment option in the Plan even though both products were grossly overpriced. Even though Mutual was a financial services company in the recordkeeping business, its Plan was more expensive than 90% of the plans in the U.S.[1] Mutual and United reaped significant profit— millions of dollars—from this arrangement at the expense of the Plan and its participants, including Plaintiffs.

Plaintiffs allege that by hiring its own subsidiary at above-market rates, Defendants breached ERISA's duty of loyalty. ERISA § 404(a)(1)(A), *codified at* 29 U.S.C. § 1104(a)(1)(A). Section 404(a)(1)(A) provides that a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." Thus, fiduciaries must act with an "eye single" to the interests of participants, and "must exclude all selfish interest and all consideration of the interests of third persons." *Pegram v. Herdrich,* 530 U.S. 211, 224 and 235 (2000). ERISA's fiduciary duties "have been described as the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (citations omitted).

To support the claim for fiduciary disloyalty, the AC includes detailed allegations demonstrating that the compensation United received greatly exceeded both (i) the cost to United of providing the services (the standard reflected in federal regulations), and (ii) the market rate that

---

[1] *See* AC ¶ 59, according to The Brightscope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plan survey in 2015.

1

should have been paid in an arms-length transaction had Mutual engaged in a prudent and loyal fiduciary process untainted by self-interest. Plaintiffs are not arguing, as Defendants contend, that United's services had to be "free." As the AC explains, express Department of Labor ("DOL") guidance limits Defendants' compensation to reimbursement of actual expense. United's compensation was excessive under that, or any, standard.

Despite the allegations of obvious self-dealing, Defendants try to confuse the issue by focusing their brief on ERISA's duty of prudence. Defendants do not cite a single on-point case about the duty of loyalty—the cases they cite address the duty of prudence only.

Moreover, Defendants' brief does not address the allegations supporting a claim for breach of the duty of loyalty. Instead, Defendants present their alternative version of the facts and ask the Court to draw inferences in their favor. Not only do Defendants' factual arguments lack merit, they are improper at the motion to dismiss stage.

Defendants repeatedly cite the Court's recent decision in *Insinga v. United of Omaha Life Ins. Co.*, 2017 WL 6884626 (D. Neb. Oct. 26, 2017). But this case is fundamentally different from *Insigna*.[2] Here, Mutual, as the plan sponsor and named fiduciary, used its fiduciary authority to appoint its wholly-owned subsidiary United to perform services for the Plan, thereby earning a profit. Effectively, Mutual was on both sides of the negotiations in this case, leaving the Plan without unbiased representation. *Insigna*, by contrast, involved an agreement between the Safe Auto Insurance Company 401(k) Plan and United, two unrelated companies who negotiated at

---

[2] Nor is this case like *Harley v. Minn. Min. & Mfg. Co.*, 284 F.3d 901 (8th Cir. 2002) which involved an appeal from a motion for summary judgment after both sides had the opportunity to present expert testimony. The issue in *Harley* was whether an independent investment manager was able to influence his own compensation, resulting in a prohibited transaction. The defendant relied on ERISA § 408(c) which provides that "[n]othing in section [406] of this title shall be construed to prohibit any fiduciary from ... receiving any reasonable compensation for services rendered ... in the performance of his duties with the plan," and presented uncontradicted expert testimony that manager's compensation was reasonable. Plaintiffs relied on 29 C.F.R. § 2550.408c–2(a) which restricts the amount of compensation a fiduciary can receive from the plan when the fiduciary is already receiving full-time pay from the employer/plan sponsor. Here, Plaintiffs rely on 29 C.F.R. § 2550.408b–2(e), which restricts Mutual and United to receiving reimbursement of their actual expense.

arms-length. *Insigna*'s claims depended on a finding that United was a fiduciary. The court determined that, ***based on the allegations of that complaint***, United was not a fiduciary.

Defendants ignore this Court's direct authority in *Muri v. Nat'l Indem. Co.*, 2018 WL 1054326, at *4 (D. Neb. Feb. 26, 2018). Like this case, *Muri* alleged that the plan's fiduciaries disloyally included investment options in the plan in order to compensate the plan's sponsor. The defendants in *Muri* made many of the same arguments Defendants make here. This Court rejected them all and denied the motion to dismiss. *Muri* explains that the plaintiff "need not rebut the possibility that there may be an alternative explanation as to why [the fiduciary] continued to offer the [challenged] … investment option." *Id.*, at *6. Here, Plaintiffs have alleged that the Separate Account K was more expensive than comparable services for comparable Plans, and that the General Account underperformed other capital preservation options. *Muri* found similar allegations sufficient to survive a motion to dismiss.

Defendants' other arguments fail as well. Defendants argue that Plaintiffs must allege that Defendants abused their discretion. But abuse of discretion governs imprudence, not disloyalty. Fiduciary disloyalty is itself, by definition, an abuse of discretion. Defendants also try to defend the "Markups" United added to the fees on the funds in the Separate Account K, arguing that it was "obvious" that United should be paid a fee. (Def. Br. at 3). But the AC alleges in detail that the total fees the Plan paid United were far above market rates. Most plans of comparable size to the Plan can invest in those same options and receive all the services United provided to Plaintiffs and the Plan without paying anywhere near as much. Defendants' arguments about the Guaranteed Account also lack merit and depend on misleading comparisons to inapposite data.

As the Eighth Circuit has explained, ERISA plaintiffs in breach of loyalty cases are not obligated to "plead facts tending to rebut all possible lawful explanations for a defendant's conduct." *Braden*, 588 F.3d at 596. Instead, allegations, such as those in the AC, that investment "options were chosen to benefit the trustee at the expense of the participants," if substantiated, show fiduciary process "tainted by failure of effort, competence, or loyalty" and "state a claim for breach of fiduciary duty." *Id.*

3

In addition to the fiduciary duty of loyalty, ERISA bars certain types of fiduciary conduct called "prohibited transactions." ERISA § 406(a)-(b), 29 U.S.C. § 1106(a)-(b). Section 406(a) prohibits transactions between plans and "parties in interest" (both Mutual and United were indisputably parties in interest under ERISA § 2(14)). Section 406(b) prohibits transactions between plans and fiduciaries. ERISA § 406(b)(1), for example, prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account."

Defendants argue that Congress and the DOL approve of the use of affiliated service providers. But that is not the case; ERISA only allows such transactions if they are inherently fair to the Plan. In self-dealing situations such as those described in ERISA §§ 404(a)(1)(A) and 406(b), "the burden of proof is always on the party to the self-dealing transaction to justify its fairness." *Braden*, 588 F.3d at 602. Defendants do not offer a substantive defense against the prohibited transaction claims, merely arguing that they are untimely. But as shown below, Plaintiffs' prohibited transaction claims are timely.

## II.    FACTS

### A.    The Parties and the Plan

Plaintiffs are participants in the Plan which is an individual account, defined contribution pension plan covered by ERISA. ¶¶ 1, 5, 23. Participant Plan accounts are comprised of employee contributions, any employer contributions, and any investment income from the investment options selected within the participant account, less fees and expenses. ¶¶ 7-8. Unlike traditional defined benefit pension plans, participants in defined contribution plans (like the Plan) receive only the value of their accounts when they retire. ¶¶ 9, 41. As a result, even small differences in compounding fees can result in vast differences in the amount available at retirement. ¶¶ 42-43.

Mutual is the Plan sponsor and its named fiduciary. ¶¶ 13, 27. Defendant United is a wholly owned subsidiary of Mutual. ¶ 28. Mutual has authority and control over selecting the Plan's

investments within Separate Account K and is thus also a fiduciary. ¶¶ 28, 44. As detailed below, Separate Account K has been amended and/or restated at least four times since March 2012.

Defendants, as the Plan's fiduciaries, had discretionary control over the Plan's investment options and service provider relationships. Rather than using this discretion solely in the best interests of the Plan participants, Defendants entered into the Separate Account K, a group annuity contract issued by United, and the Guaranteed Account with United, Mutual's subsidiary, for the purpose of profiting from their own employees. ¶¶ 44-46. Defendants thereby caused the Plan and its participants to pay excessive fees for such services despite the ready availability of comparable or better services that were significantly less expensive and/or better performing. ¶¶ 46-48, 52.

### B.    Defendants Enrolled the Plan in the Affiliated Separate Account K

"Separate Account K" is a group annuity contract designed as a way for United, and hence Mutual, to collect fees from Plan participants beyond what the investment providers charged, and to hide those fees from the Plan (and others). ¶¶ 15-17, 36, 76. Through Separate Account K, Defendants offered many commonly available mutual funds as investment options for the Plan's participants. In addition, however, to the fees charged by the underlying fund managers, Defendants charged significant additional "Markups" that other investors in those funds do not pay. Because all the Plan's investment options were offered through the Separate Account K, every investment option in the Plan was laden with these Markups. ¶ 16. Defendants performed no investment management services in exchange for the Markups they charged on the funds in the Separate Account K. ¶ 17. Instead, all the investment management functions were performed by the third-party managers of the underlying funds. *Id.*

Due to economies of scale, the relative cost of recordkeeping and investment services should decline when the number of participants in a retirement plan increases. ¶ 55. Compared to the market on a per participant or a per asset basis, Defendants' services were more expensive for

the Plan than comparable services for other similarly sized plans. ¶¶ 59-70. For example, the average per participant fee for comparable plans is $64, which the Plan paid $195 (even excluding the spread on the General Account). ¶¶ 62-63.

### C.   Defendants Enrolled the Plan in the Affiliated Guaranteed Account

Defendants, as the Plan's fiduciaries, also elected to include a capital preservation investment option in the Plan called the Guaranteed Account (sometimes referred to as the "GA"), which was managed by United. ¶ 20. Defendants selected and retained the GA because it allowed them to receive hefty profits from the spread between the Crediting Interest Rate ("CIR") paid to participants and the actual returns on the investments held in the GA. ¶ 20.

Under the GA, United deposits the assets that are directed by participants to be invested in the GA (the "principal amount"), into its own general account, to be invested along with all the other assets in United's general account. Each month, United selects a CIR that it then applies to that month's contributions to the GA for the lesser of five years or until the assets are withdrawn. United can set the CIR as low as zero percent (0%). ¶ 77. United keeps the difference between the actual earnings on the amounts Plan participants contributed and the CIR, which is called the "spread." ¶ 78. From the spread, United reimburses itself for its own "costs" for providing the GA, charges investment and administrative fees, and makes a significant profit. ¶ 79.

United does not disclose the amount of the spread or the return on the underlying investments in United's general account that back the GA.  For the past several years the spread has been larger than the CIR. ¶ 81. In other words, United has kept more of the investment returns on the underlying assets than it pays to the participants in the Plan. *Id*. Moreover, the spread retained by United vastly exceeds any costs it incurs in managing and offering the GA. ¶ 82. Because United is a wholly owned subsidiary of Mutual, these profits ultimately inure to the benefit of Mutual. ¶ 83. The profits Defendants reap from the spread directly reduce the benefits

6

Plan participants are entitled to receive at retirement. ¶ 84. Finally, as shown in the AC, the GA consistently underperforms comparable insurance company capital preservation products, according to the Stable Value Investment Association index. ¶¶ 85-87.

**D.      Defendants' Concealment of their Misconduct**

Defendants did not disclose to Plan participants either the substantial markups that only they paid, or the spread United retained on the GA. ¶ 93. The fee disclosure Mutual provided falsely reported that the GA charged no fees when in fact United was profiting from the spread as described above. ¶ 94. The fee disclosures also did not disclose the markups. ¶ 95.

**E.      Defendants' Misconduct Occurred During the Six-Year Limitations Period**

The repeated, ongoing transfers of Plan assets to United, are prohibited under 406(a)(1)(C), and thus fall squarely within the limitations period. ¶¶ 45-47, 67-71. Moreover, there were at least five occasions during the six-year limitations period that required Mutual to review United's contract and compensation: (1) on or about March 26, 2012, with the inception of the first Administrative Fee Credit Account (ECF No. 40-3 at 2); (2) on July 31, 2012, when all plan fiduciaries and "covered service providers," including United, were required to provide to Mutual with detailed disclosures of all services being provided and compensation to be received, (Reasonable Contract or Arrangement Under Section 408b-2-Fee Disclosure, 77 FR 5632 (Feb. 3, 2012)); (3) on or about March 16, 2015, when the terms of the Administrative Fee Credit Account ("AFCA") were amended (ECF No. 40-3 at 3); (4) on or about May 1, 2017, when the Table B (authorizing the Markups) was amended (ECF No. 32-4); and (5) on or about November 29, 2017, when the terms of the AFCA were last amended (ECF No. 40-3 at 3). On each of those occasions, Mutual, as plan fiduciary, reviewed the contractual terms and determined that United's compensation was lawful and reasonable.

III.    **LEGAL STANDARD**

A complaint "must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). To satisfy this standard, a complaint must include sufficient factual content that, when accepted as true, "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594. "In reviewing the complaint, the court assumes the facts alleged are true and draws all reasonable inferences from those facts in the plaintiff's favor." *Wildman v. Am. Century Servs., LLC*, 237 F. Supp. 3d 902, 909 (W.D. Mo. 2017).

In cases alleging ERISA fiduciary breach, participant plaintiffs are not "required to describe directly the ways in which [defendants] breached their fiduciary duties," or "the process by which the Plan was managed" *or* "to plead facts tending to contradict . . . inferences" supporting alleged lawful conduct. *Braden*, 588 F.3d at 595-96. Courts "must be cognizant of the practical context of ERISA litigation," *id.* at 598, and "attendant to ERISA's remedial purpose and evident intent to prevent through private civil litigation 'misuse and mismanagement of plan assets.'" *Id.* at 597 (quoting *Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 140 n.8 (1985)). This special standard is a needed because "no matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Id.* at 598; *see also Allen v. GreatBanc Trust Co.*, 835 F.3d 670 (7th Cir. 2016) ("[A]n ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which she has no access, as long as the facts alleged tell a plausible story.").  Moreover, Plaintiffs' claims

8

regarding Defendants' violations of 29 C.F.R. § 2550.408b-2(e)(3) allege pure violations of law that no prudent process, however robust, can absolve.

IV.   **ARGUMENT**

A.   **Plaintiffs' Claims Are Timely**

Defendants do not challenge the timeliness of Plaintiffs' fiduciary breach claims. Defendants argue, though, that Plaintiffs' prohibited transaction claims in Count II are untimely under ERISA's six-year limitations period. Defendants' argument fails for several reasons.

Most fundamentally, less than six years prior to the filing of the AC in January 2018, in March 2012, Mutual exercised its discretion as a fiduciary to renew and amend its agreement with United. *See* ECF Nos. 40-02 and 40-14. Defendants naturally minimize this key transaction. But because Mutual entered the operative contract less than six years prior to the filing of the AC, Defendants' limitations argument fails.

Defendants also urge the Court to find that any "transaction" prohibited by ERISA § 406 must be considered a single, discrete event. Even if the conduct at issue lasts many years, for limitations purposes, if any conduct that was prohibited by ERISA § 406 took place more than six years ago, Defendants expect to get a free pass in perpetuity and all claims based on that conduct are time barred. While discrete transactions can certainly be prohibited, "furnishing of services" entails ongoing activity that represents a series of transactions and repeated services, which requires an annual review of compensation for filing the Plan's Annual Returns.  If compensation is asset-based, as here, compensation might be reasonable in the early years and become unreasonable as assets grow. Here, for example, the ongoing services provided by United are prohibited by 406(a)(1)(C), and the repeated, ***ongoing transfers of Plan assets to United in the form of periodic contributions*** (¶¶ 45-47, 67-71) are prohibited by 406(a)(1)(D). Defendants make

9

no convincing argument why the prohibited transaction provisions should not apply to ongoing courses of conduct.[3]

Defendants' argument is also inconsistent with ERISA § 413. The six-year period is triggered "in the case of an omission the latest date on which the fiduciary could have cured the breach or violation." ERISA § 413(1). In this case, Defendants' prohibited transactions include omissions such as Mutual's ongoing self-dealing with Plan assets by failing to extricate the Plan from its arrangements with United in violation of 406(b)(1).

Defendants also overlook the AC's allegations that Defendants actively and knowingly concealed their misconduct from the Plan and its participants. ¶¶ 92-96. For example, the relevant disclosures do not disclose the existence or amount of the Markups. Instead, the disclosures lump the Markups together with other fees charged by the underlying asset managers and present a single undifferentiated fee, which under the circumstances--including notorious federal regulation expressly requiring separate disclosure of these fees--is intentionally misleading about the nature of the fees being charged. When a fiduciary conceals its misconduct, ERISA's limitations period is tolled. *See* ERISA § 413; *see also Schaefer v. Arkansas Med. Soc.*, 853 F.2d 1487, 1491 (8th Cir. 1988).

---

[3] In light of the protective purpose of ERISA § 406, most courts interpret it broadly. *Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir. 1984); *Lowen v. Tower Asset Mgmt.*, 827 F.2d 1209, 1213 (2d Cir. 1987); *Solis v. Bruister*, 2012 WL 776028, at *2 (S.D. Miss. Mar. 8, 2012). Furthermore, as detailed in Section II.E., above, there were in fact at least five other occasions during the six-year limitations period that required a review of United's contract and compensation. On each of those occasions, Mutual, as plan fiduciary, reviewed the contractual terms and made a determination that the compensation United charged was lawful and reasonable. *E.g.*, *Perez v. Chimes D.C., Inc.*, 2016 WL 4993293, at *6 n.10 (D. Md. Sept. 19, 2016) (distinguishing *David v. Alphin*, 704 F.3d 327, 340 (4th Cir. 2013) cited by Defendants, on these grounds).

Ultimately, to the extent the May 2012 Mutual-United agreement (less than six years before the case was filed) does not itself dispose of Defendants' limitations argument, each of these issues is intensely factual in nature and inappropriate for judgment incident to a Rule 12(b)(6) motion. Other courts hold thus. *E.g.*, *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1355 (N.D. Ga. 2017).[4]

### B.      Plaintiffs State a Claim for Breach of ERISA's Duty of Loyalty

The AC alleges that Defendants violated ERISA's duty of loyalty, ERISA § 404(a)(1)(A); 29 U.S.C. § 1104(a)(1)(A) and explains in detail how Defendants abused their positions as fiduciaries for the Plan to reap millions of dollars in profit at the Plan's expense. Defendants claim to have provided services in exchange for those fees, but the AC also alleges in detail that the fees received by Defendants were far in excess of what comparably sized plans pay on the open market for such services. ¶¶ 58-66.

The allegations in the AC are not limited to the "affiliation" between the Defendant fiduciaries and the service providers paid by the Plan, but rely on a variety of comparators to show that the services were overpriced. Those allegations are more than sufficient to state a claim for the breach of the duty of loyalty. *E.g.*, *Braden*, 588 F.3d at 596 ("The complaint alleges, moreover, that these options were chosen to benefit the trustee at the expense of the participants. If these allegations are substantiated, the process by which appellees selected and managed the funds in the Plan would have been tainted by failure of effort, competence, or loyalty. Thus the allegations state a claim for breach of fiduciary duty.").

---

[4] In a footnote to their brief, Defendants make sweeping arguments about the applicability of the prohibited transactions exemptions in ERISA § 408. Those exemptions are affirmative defenses to be proven by Defendants, and are not before the Court in this motion, which challenges only the limitations issue.

11

Defendants' motion to dismiss ignores the standards that govern conflicted fiduciary transactions. Thus, Defendants entirely fail to engage in the sort of "careful, context-sensitive scrutiny" to which they pay lip service. *See* Def. Br. at 11. A "careful, context-sensitive scrutiny" of the millions of dollars in unnecessary fees Defendants—the Plan's fiduciaries—collected at the expense of the Plan requires consideration of ERISA's duty of loyalty.

Numerous courts have found that allegations similar to those at issue here state a claim for fiduciary disloyalty. *E.g.*, *McDonald v. Jones,* 2017 WL 372101 (E.D. Mo.) (denying motion to dismiss disloyalty claims related to selection of affiliated investment products); *Wildman v. American Century Services, LLC*, 237 F. Supp. 3d 902, 912-13 (W.D. Mo. 2017) (same); *Kreuger v. Ameriprise*, 2012 WL 5873825 (D. Minn) (same); *Main v. American Airlines*, 248 F. Supp. 3d 786, 792-93 (N.D. Tex. 2017) (same); *Moreno v. Deutsche Bank*, 2016 WL 5957307, *6 (S.D.N.Y.) (same); *Urakhchin v. Allianz*, 2016 WL 4507117 (C.D. Cal.) (same); *Cryer v. Franklin Templeton*, 2017 WL 818788 (N.D. Cal.) (same). Here too Defendants motion should be denied.

### 1.  <u>Defendants' Disloyal Management of the Plan Was an Abuse of Discretion</u>

The AC alleges that Defendants breached their ***duty of loyalty*** to the Plan by self-dealing. Ignoring that, Defendants argue that to state a claim for a breach of the ***duty of prudence***, the AC must allege that a fiduciary abused its discretionary authority. Disloyalty and self-dealing are quintessential examples of fiduciary abuse of discretion. Under the common law of trusts, "an abuse of discretion occurs when a trustee, even in good faith, exercises a power in a manner that is inconsistent with the duty of loyalty…" Restatement (Third) of Trusts § 87 (2007); see also *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) (because ERISA's fiduciary duties are "derived from the common law of trusts," "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts.").

12

Because the allegations in the AC, taken as true, show disloyalty and self-dealing by Defendants, it clearly states a claim for breach of fiduciary duty. *Braden*, 588 F.3d at 596 (allegations that investment "options were chosen to benefit the trustee at the expense of the participants," if substantiated, shows fiduciary process "tainted by failure of effort, competence, or loyalty" which "state a claim for breach of fiduciary duty").

### 2.     Defendants' Affiliation with the Service Providers is "Relevant" to Whether they Breached the Duty of Loyalty

Defendants next argue that there is no "inference" of disloyalty simply because they hired their own affiliates as service providers based on *Meiners v. Wells Fargo*, 2017 WL 2303964 (D. Minn. May 25, 2017). But, *Meiners* held that a fiduciary's "choice of affiliated funds *is relevant*" to determining "financial self-interest," *id.* at *3 (emphasis added). *Meiners* simply required that more than just affiliation be alleged. As detailed below, Plaintiffs allege much more than just affiliation. Plaintiffs allege that the fees Defendants received were excessive and that better performing, cheaper products were available,[5] and Plaintiffs support those allegations by citing several industry-standard publications and other sources.

Moreover, in *Muri*, 2018 WL 1054326, this Court rejected precisely the same arguments Defendants now advance. In *Muri*, a case Defendants do not cite, the plan's fiduciaries included a fund that invested in the fiduciary's parent company as a plan investment option. Thus, the plaintiff in *Muri* alleged the fiduciary "breached its duty of loyalty by offering an imprudent investment option … for the benefit of its… parent company." *Id.* at *6. Rejecting a requirement that a plaintiff "rule out every possible lawful explanation for the conduct he challenges," the *Muri* court held that allegations "sufficient to raise an inference that in offering, and failing to remove" a challenged investment option, the fiduciary "failed to act in the sole interest of participants and beneficiaries"

---

[5] In fact, all of the funds other than the GA were available on the market without the Markups.

stated a duty of loyalty claim. *Id.* In *Muri*, as here, the plaintiff alleged that the investment option had been included "despite the fact that it was 'more expensive' and 'underperformed'" many comparable funds which had less concentrated risk. *Id.* The AC's allegations about Defendants' excessive fees are even more robust than those in *Muri*.

Defendants also cite, out of context, a 1991 Federal Register statement that it would be "contrary to normal business practice for a company whose business is financial management to seek financial management services from a competitor." (Def. Br. at 13) (quoting 56 Fed. Reg. 10,724, 10,730 (Mar. 13, 1991)).  Read in full, the Federal Register's statement only prevents dealing with an affiliate from being ***automatically illegal***. *E.g.*, *Wildman*, 237 F. Supp. 3d at 913 (an applicable prohibited transaction exemption will "not relieve a fiduciary from its duties of loyalty and prudence to a plan").[6]  But to be clear, Plaintiffs do not claim Defendants are absolutely prohibited from selecting their own products and services, only that they have failed to meet the conditions necessary to do so.

Defendants jump to the conclusion that "United's affiliation with Mutual is perfectly consistent with lawful fiduciary conduct." But neither judicial decisions nor regulatory authorities support that proposition. The DOL's regulations provide, for example, that with respect to self-dealing transactions under § 406(b):

> These prohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes such persons fiduciaries when they have interests which may conflict with the interests of the plans for which they act. In such cases, the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries. Thus, **a fiduciary may not use the authority, control, or responsibility which makes such person a fiduciary to cause a plan to pay an**

---

[6] Fed. Reg. 10,724, 10,730 (noting that financial management company that provides services to its own plan is still subject to the "requirement as described in section 404(a) of ERISA."). There is a wide gap, which Defendants ignore, between not being automatically illegal and being completely lawful.

**additional fee to such fiduciary (or to a person in which such fiduciary has an interest which may affect the exercise of such fiduciary's best judgment as a fiduciary) to provide a service.**

29 C.F.R. § 2550.408b-2(e) (emphasis added). [7]

Mutual has a mechanism provided by 29 C.F.R. § 2550.408b-2(e)(3) for engaging its affiliate:

> If a fiduciary provides services to a plan without the receipt of compensation or other consideration (other than reimbursement of direct expenses properly and actually incurred in the performance of such services within the meaning of § 2550.408c-2(b)(3)), the provision of such services does not, in and of itself, constitute an act described in section 406(b) of the Act.

Therefore, Mutual could hire United on behalf of the Plan *only if the only compensation Mutual and/or United receives from the Plan is the reimbursement of direct expenses actually incurred in the performance of the services.* [8]

There is a wide gap, which Defendants ignore, between not being automatically illegal and being completely lawful.

### C.   The AC Alleges that Separate Account K Was More Expensive Than Comparable Services on the Market

---

[7] *See also* DOL Advisory Opinion 2011-06A (Feb. 4, 2011) ("Some common ownership and control connections may be so substantial that they would give rise to an impermissible interest … For example, parties belonging to a controlled group of corporations … generally would be sufficiently affiliated so that such relationships would affect the fiduciary's best judgment.").

[8] This has been a guiding principle of the DOL and among plan sponsors for decades. *See* ERISA Opinion Letter 2001-10A (Dec. 14, 2001) ruling that Laurel Trust could not profit from serving as trustee for its own retirement plans, available at: https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/advisory-opinions/2001-10a; and ERISA Opinion Letters 89-09A (June 13, 1989) and 97-19A (Aug. 28, 1997) ruling that plan sponsors providing administrative services to their own plans could only be reimbursed for actual expenses that would not have been incurred but for providing services to the plans, available at: https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/advisory-opinions/1997-19a.

The AC contains well supported factual allegations that the prices paid by the Plan for United's services through Separate Account K far exceeded what comparable plans pay for similar services in the market.[9]

### 1. United Provides Only Standard Recordkeeping and Platform Services to the Plan, as it Admitted in the Original Motion to Dismiss

Defendants assert that Plaintiffs ignore the substantial services provided (which seems to include certain fiduciary functions). While that is clearly not true, those services in the market do not warrant the fees that United was charging. On a motion to dismiss, well pleaded and well supported factual allegations like those in the AC must be accepted as true. Those allegations are more than enough to state a claim for breach of the duties of loyalty and prudence under clearly established law in the Eighth Circuit, *see Braden*, 588 F.3d at 596; *Wildman*, 237 F. Supp. 3d at 913; *McDonald*, 2017 WL 372101, at * 2, a law that Defendants do not bother to cite or distinguish in their brief.

All of the services described by Defendants, and more, are routinely offered by large platform providers to plans like the Plan, without charging a 35 bps across-the-board markup. Defendants' arguments thus fundamentally distort the market for retirement plan investment management services. More importantly, many of the services described (other than recordkeeping), are routinely performed by plan sponsors for their own plans at no cost. But again, a these are material factual disputes inappropriate for resolution on a motion to dismiss.

Defendants assert that "[n]owhere do Plaintiffs compare United's costs to what the Plan

---

[9] Defendants trumpet their original motion to dismiss. However, their first motion contained many misleading factual arguments that proved to be false. For example, in their original motion, Defendants argued that because other plans invested in the Separate Account K, the Plan's decision to do so was justified. In actuality, all of the other plans in the Separate Account K were much smaller than the Plan, and thus, were incapable of obtaining the economies of scale that large plans like the Plan can obtain. *See* AC ¶¶67-69. Faced with the incontrovertible truth, Defendants have now abandoned that argument.

would have paid a similar provider for similar services—or suggest what those costs might have been." (Def. Br. at 15). Plaintiffs respectfully direct the Court to the AC, which contains precisely such comparisons, well supported by publicly available market analysis. AC ¶¶ 56-60. The AC plausibly alleges that Defendants got the Plan a "raw deal" (to use Defendants' phrase), specifically for the purpose of lining Defendants' pockets at the expense of the Plan. Again, while Defendants rely on ERISA's duty of prudence, and not the relevant duty of loyalty, the language of the statute actually supports Plaintiffs' position. "Under the circumstances then prevailing," a prudent and loyal fiduciary "in the conduct of an enterprise" of like character and with like aims to the Plan, could have gotten superior services and investments at a fraction of the price the Plan paid United. The great majority of such fiduciaries did exactly that.

### 2. The Plan Paid More than the Market Rate for United's Services

In the AC, Plaintiffs calculated the costs the Plan paid for United's services and compared those costs to several market benchmarks for comparable services. (AC ¶¶ 61-64). In particular, Plaintiffs compared the amounts the Plan paid United to (a) a benchmark calculating "Total Plan Cost" as a percentage of plan assets, and (b) a benchmark calculating costs on a per participant basis. Because the Plan paid more than comparable plans for comparable services under both benchmarks, Plaintiffs state a claim for breach of the duty of loyalty.

Notably, Defendants do not dispute that Plaintiffs' allegations about the costs of United's services, taken as true, are sufficient to state a claim for breach of the duty of *loyalty*, but instead, argue that Plaintiffs have failed to state a claim for the duty of *prudence*, which is not the primary issue in this case.

### a. Costs as Percentage of Plan Assets

Defendants argue that Plaintiffs wrongly exclude the Guaranteed Account from calculating the Total Plan Cost, and that including the Guaranteed Account reduces the total plan cost from

17

0.49% to 0.42%. But Defendants' approach ignores the spread on the Guaranteed Account. The AC alleges that the Plan paid closer to 200 basis points, in the form of "spread," that United retained as the difference between the earnings on the Plan assets in the Guaranteed Account and the amounts United credited to Plan participants. ¶ 61. It makes no sense, as Defendants suggest, to exclude the spread from the computation of Total Plan Costs.[10]

When the spread is taken into account, the Plan paid United roughly 81 bps.  ¶ 61.  At 81 bps in Total Plan Costs, the Plan's fees were higher than 90% percent of Plans in almost every size category in assets in the ICI/Brightscope Report. (Def. Br. Ex. 14 at 54, Fig. 4.2).

Defendants argue that the AC erroneously compares the Plan to plans in the Brightscope report with more than $1 billion in assets. Defendants are correct that the Plan had less than $1 billion of assets. But that does not change the result. As explained above, including the Guaranteed Account and the spread it generated, the Plan paid more fees to Defendants than any remotely comparable plan. However, even excluding the Guaranteed Account and spread, the Plan paid 0.49 bps, and even if, as Defendants suggest, the Guaranteed Account should be included but not the spread, the cost was no less than 0.42%. Even then, roughly 50% of plans with between $500 million and $1 billion obtained comparable services for less than the Plan.  Defendants persistently ignore the explicit rule under 29 C.F.R. § 2550.408b-2(e)(3) that in order to avoid a self-dealing violation under ERISA § 406(b)(1), its compensation is limited to reimbursement of actual expense.

### b. Per Participant Costs

The AC alleged that the Plan paid United $195 per participant for its services during the

---

[10] By way of example, the Plan could simply have invested in the same underlying investments in the General Account. In exchange for reduced risk of volatility, the Plan gives up 200 basis points of yield. That is, by any definition, a cost.

relevant period. ¶ 64. Defendants do not challenge the accuracy of the $195 per participant figure. Plaintiffs pointed to market data showing that $64 per participant was average for comparable services. Defendants argue, without support, that the $64 services are qualitatively inferior to the services United provides. A motion to dismiss is not the place to resolve such a dispute.

Plaintiffs also cited disclosures showing that the Plan also paid another recordkeeper (Ascensus) $20 per participant for recordkeeping services. ¶ 62. Defendants argue that the $20 payment to Ascensus proves that United was providing some sort of service worth the other $175. (Def. Br. at 17). But Defendants miss the point. *All* of the services provided by United are typically bundled as recordkeeping services and provided by a recordkeeper, as alleged in the AC. ¶ 18. And $20 per participant is not an unreasonable payment for those services and can be reimbursed. Thus, the implication of the payment to Ascensus, is, if anything, that the Plan could have obtained comparable recordkeeping services for just $20 per participant without involving United at all.

### 3.   United's Markups Caused the Plan to Pay Above Market Rates to United

United charged a markup on all of the funds included as investment options in the Plan, such that the markup, plus any revenue sharing, equaled roughly 35 bps paid to United for each fund. See ECF No. 40-4 (adding columns 'Shareholder Service Fee' + 'United Product Charge'). Defendants do not dispute that they charged the Markups.

Defendants argue that the Plan offered many "institutional" share classes, and that the Plan was invested in these institutional class funds "because it used United's product." (Def. Br. at 18). Plainly any benefit from investing in "institutional" share classes was more than offset by the 35 bps markup paid to United. Many other Plans the size of the Plan invest in comparable funds, indeed the same funds, in the institutional share class, but do not pay fees comparable to the markup to United. The Plan did not thereby derive any benefit from investing through United's

19

Separate Account K product—and indeed was actually harmed. Again, Defendants fall back to imprudence, but Defendants' misconduct is not a matter of negligently failing to select a "slightly lower-cost option." (Def. Br. at 18). Defendants' conduct is a matter of disloyally and systematically adding unwarranted markups onto all of the options offered to its workers for their retirement investing.

Defendants also argue that they provided "fee credits" to the Plan. (Def. Br. at 18). These "fee credits" were disclosed with the original motion to dismiss in previously non-public documents.[11] The allegations in the AC, including all of the numbers cited above, assumes that "fee credits" were in fact paid. Thus, the Total Plan Cost and per participant cost calculated above would have been even higher had the "fee credits" not been taken into consideration. Thus Plaintiffs do not "ignore" the fee credits as Defendants suggest.

A motion to dismiss is not the appropriate forum for weighing factual allegations. Yet Defendants' motion impermissibly asks the Court to "ignore[] reasonable inferences supported by the facts alleged" and asks the Court to "dr[a]w inferences in [Defendants]' favor." *Braden*, 588 F.3d at 595. Instead, an ERISA plaintiff has no burden to "rebut" all "lawful reasons [Defendants] chose the challenged investment options" in a complaint. *Id.* at 596. The AC's allegations, taken as true, support the inference that Defendants structured the Plan's investments and services "to benefit [Defendants] at the expense of the participants" despite "the ready availability of better options." *Id.* Thus even crediting Defendants' seriously flawed factual arguments, Plaintiffs state a claim for breach of the duty of loyalty.

### D. Defendants Breached their Fiduciary Duties by Including and Retaining the Guaranteed Account in the Plan

---

[11] While Plaintiffs are highly skeptical that such fee credits were actually provided, the opacity of the Plan's financials reported in the Form 5500s precludes any independent verification at this stage.

Plaintiffs allege that Mutual breached its fiduciary duty of loyalty by including the GA when there were other better performing alternatives in the market. The AC cites both the Stable Value Investment Association ("SVIA") composite average (which consists of many comparable funds) and the Mass Mutual GIC as comparators. ¶¶ 87-89. By including the GA, United could control the CIR and thus the spread, and thereby obtain proceeds vastly in excess of any costs it incurred in managing the GA. United, in fact, has kept more of the investment returns for itself than it has paid to participants in the Plan. ¶¶ 81-84. As a wholly owned subsidiary of Mutual, United's outsized profits inure to the benefit of Mutual. *Id.*

Defendants rely on *Insinga*, 2017 WL 6884626, at *4–5, which is fundamentally different from this case. Although the plaintiff in *Insigna* challenged United's conduct in setting the CIR, the Court determined that United was ***not*** a fiduciary of the Safe Auto Insurance Company retirement plan in which plaintiff was a participant. In this case, unlike *Insigna*, Mutual—United's corporate parent—is the Plan's fiduciary and sponsor, and unlike *Insigna*, Mutual stood to directly profit from the inclusion of the GA as an investment option in the Plan. Thus, this case turns on issues not reached by the Court in *Insigna*, including whether Mutual breached the duty of loyalty by including the GA, whether better options than the GA were available on the market, and whether Mutual permitted United to retain the majority of the GA's investment returns.

Defendants do not deny the allegation that United kept more of the investment returns on the underlying assets than it paid to the Plan. Instead, Defendants hyperbolically assert that the alternative was offering the GA "for free." (Def. Br. at 21.) That is obviously not so. Defendants' other contentions, about bearing the risk of crediting rate shortfalls, are not different than issues

facing managers of other comparable investment options.[12] Moreover, Plaintiffs anticipate that discovery will show that United was well aware of the underlying assets, over which it had total control, and was able to predict and control its returns on those assets, and thus mitigate its crediting rate risk. Either way, these issues are not appropriate for a motion to dismiss.

Defendants argue that there is no cause of action for underperforming funds, citing *Sweda v. University of Pennsylvania*, 2017 WL 4179752 (E.D. Pa. Sept. 21, 2017), *appeal filed*, No. 17–3244 (3d Cir. Oct. 13, 2017). Defendants ignore the fact that *Sweda*, which is presently on appeal to the Third Circuit, did not concern a breach of the duty of loyalty as this case does. When considering a claim for disloyalty, this courts and others in this Circuit have found that allegations that a fund "underperformed," coupled with a benefit to the plan fiduciary, adequately support a claim for disloyalty. *Muri*, 2018 WL 1054326, at *6; *see also Wildman*, 237 F. Supp. 3d at 914 (denying motion to dismiss ERISA disloyalty claim even when the affiliated funds had "comparable performances" to options in the market).

Moreover, the majority of courts faced with similar claims to those in *Sweda* held that plan fiduciaries who include consistently underperforming funds (as Defendants did here) breached their fiduciary duty of prudence. *See*, *e.g.*, *Henderson*, 252 F. Supp. 3d at 1349–53 ("plaintiffs have properly alleged that the defendants acted imprudently by retaining underperforming funds") (citing *Tibble*, 135 S. Ct. 1823); *Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *7 (S.D.N.Y.

---

[12] *See*, *e.g.*., Def. Ex. A-24 at 3 (the comparable Mass Mutual Guaranteed Interest Account invests "in various fixed income sectors, including Treasuries, agencies, public bonds, private placements, bank loans, commercial mortgage loans, mortgage-backed securities, and other types of debt."); Def. Ex. A-25 at 3 (assets in the Mass Mutual Guaranteed Interest Account include long-term bonds and mortgage loans). Indeed, the performance benchmark for the GA chosen by Defendants is a U.S. Treasury-Bill index, "USTREAS Treasury Bill Constant Maturity Rate 3 Year." Def. Ex. A-11 at 4.

Sept. 29, 2017); *Kelly v. Johns Hopkins Univ.*, 2017 WL 4310229, at \*2 (D. Md. Sept. 28, 2017);

*Sacerdote v. New York Univ.*, 2017 WL 3701482, at \*8–9 (S.D.N.Y. Aug. 25, 2017).

Defendants next argue that their retention of the poorly performing GA should be excused because participants were aware of the CIR when they purchased their contracts, and the Plan offered other investment options. (Def. Br. at 21.) This argument disregards well-established precedent. As *Muri* ruled, "a fiduciary cannot 'insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them.'" *Id.*, 2018 WL 1054326, at \*4 (quoting *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009), also citing *Pfeil v. State St. Bank & Tr. Co.*, 671 F.3d 585, 597 (6th Cir. 2012), *abrogated by Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014)).

Notably, the GA consistently and substantially underperformed the average annual rate of insurance company capital preservation investments, according to the SVIA. ¶ 87. Defendants do not contest the accuracy of these allegations, but insinuate that the SVIA, as a composite average, is not an appropriate comparator. (Def. Br. at 23). The SVIA composite average is cited in the FAC to demonstrate that many comparable funds were available that performed better than the GA. Ultimately, Defendants' contentions are factual questions inappropriate for a motion to dismiss.

The same holds true for Defendants' criticism about using the Mass Mutual Guaranteed Interest Account ("MMGIA") as a comparator to the GA.[13] This argument misses the point— Plaintiffs do not assert that any spread (no matter how minimal) is improper. However, the GA's

---

[13] Defendants argue that the MMGIA has a spread, like the GA, and that Plaintiffs' comparison of the rate of return on the Mass Mutual account is a tacit admission that it is acceptable for insurance company general account products to have a spread. (Def. Br. at 23.)

excessive spread, which was greater than the amount paid to participants, is unjustifiable given the absence of arm's length negotiation here and in light of the availability of better options on the market. Moreover, Plaintiffs do not allege that the MMGIA is the best possible alternative to the GA. The MMGIA is simply an example of a similar capital preservation investment that (unlike the GA) has had performance close to the SVIA index.

Defendants fault Plaintiffs for including historical performance data going back 20 years, because that is beyond the six-year limitations period. (Def. Br. at 24). But all historical data when electing to retain the GA six years ago or any time since.[14]

Finally, Defendants argue that the GA had better rate of return than the Mass Mutual account over the most recent 1-, 5- and 10-year periods. Def. Br. at 24. But Defendants quote the wrong numbers from the MassMutual product. The annual returns from the MassMutual product cited in the AC (and in the exhibits Defendants attach, but higher on the page than the trailing return numbers Defendants quote) are more closely analogous to the average annual return numbers for the GA cited in the AC. Defendants offer no explanation for citing the trailing annual returns instead of the average annual returns in their brief. To the extent Defendants mean to contend that the trailing annual returns for the MassMutual product are a better comparator, they are wrong, but the issue is at best a disputed factual matter not ripe for resolution at this stage.

### E. Defendants Make No Valid Argument to Dismiss the Disloyalty Claims

On the last page of their brief, Defendants for the first time acknowledge the actual claim Plaintiffs plead in the AC -- that Defendants managed the Plan disloyally in violation of ERISA § 404(a)(1)(A). Even then, Defendants do not cite any of the on-point case law regarding the duty

---

[14] Moreover, as explained above, Defendants' concealment of their misconduct tolls the applicable statute of limitations. ERISA § 413(2).

of loyalty.[15] Defendants claim, without support, that the disloyalty claims in this case are simply "relabeled" imprudence claim. Here, Defendants, the Plan's fiduciaries, made millions of dollars selling their own services and investment products to the Plan in non-arm's length transactions.

The cases Defendants cite do not involve disloyalty. *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 835 (N.D. Cal. 2005) fiduciaries that merely "place[d] themselves in a position where they might act disloyally." Defendants went far beyond that here, and actually used their conflicted positions to enrich themselves at the Plan's expense.[16] The derivative disloyalty claim in *In re Target Corp. Sec. Litig.*, 275 F. Supp. 3d 1063, 1090 (D. Minn. 2017) was premised on the allegation that some of the fiduciaries had disloyally failed to prevent imprudent conduct by other fiduciaries—but because the other fiduciaries were not imprudent, there was no disloyalty.

A much more factually analogous case is this Court's recent decision in *Muri*, 2018 WL 1054326. Defendants ignore *Muri*. Unlike the cases Defendants cite, *Muri* is on point, and denied a motion to dismiss a loyalty claim where plan's fiduciary included, as an investment option, a fund that invested in fiduciary's parent company. As in *Muri*, Defendants choose their own affiliated products and services over comparable, better performing, less expensive services on the market, enriching themselves at the expense of the plan.

---

[15] As previously noted, such cases include: *McDonald,* 2017 WL 372101; *Wildman, LLC*, 237 F. Supp. 3d at 912-13; *Kreuger*, 2012 WL 5873825; *Main*, 248 F. Supp. 3d at 792-93; *Moreno*, 2016 WL 5957307, *6; *Urakhchin*, 2016 WL 4507117; *Cryer*, 2017 WL 818788.

[16] Defendants state "Plaintiffs cannot state such a claim by simply relabeling alleged imprudence as "self-dealing" citing *Brotherston v. Putnam Invs., LLC*, 2017 WL 2634361, (D. Mass. June 19, 2017), *appeal docketed*, No. 17-1711 (1st. Cir. July 20, 2017). Nothing in that case even suggests Defendants proposition.  Nor does the additional quoted language they provide appear anywhere in that decision. Likewise, they further state: "Plaintiffs must allege "actual disloyal conduct" that is separate and distinct from conduct alleged in support of her claim that Defendants breached their duty of prudence," citing *In re McKesson*. Again, nothing in that decision support Defendants' statement.

## V.    <u>CONCLUSION</u>

Defendants' Motion fails to cite the relevant, governing authorities, and makes virtually no mention of the disloyalty claims actually alleged in the AC. Defendants also improperly invite the Court to resolve a host of factual disputes on the pleadings. Read closely, Defendants' brief never even suggests that the facts alleged, taken as true, are insufficient to state a claim for breach of ERISA's fiduciary duty of loyalty. As such, Defendants' Motion should be denied.

DATED this 31st day of July.

By:      <u>s/ James A. Bloom</u>
         Todd M. Schneider
         Kyle G. Bates
         James A. Bloom
         SCHNEIDER WALLACE COTTRELL
         KONECKY WOTKYNS LLP
         2000 Powell Street, Suite 1400
         Emeryville, California 94608
         Telephone: (415) 421-7100
         Facsimile: (415) 421-7105
         tschneider@schneiderwallace.com
         kbates@schneiderwallace.com
         jbloom@schneiderwallace.com

         Garrett W. Wotkyns
         John J. Nestico
         SCHNEIDER WALLACE COTTRELL
         KONECKY WOTKYNS LLP
         8501 N. Scottsdale Rd., Suite 270
         Scottsdale, Arizona  85253
         Telephone: (480) 315-3841
         Facsimile: (866) 505-8036
         gwotkyns@schneiderwallace.com
         jnestico@schneiderwallace.com

         Todd S. Collins (*Pro Hac Vice*)
         Shanon J. Carson (*Pro Hac Vice*)
         Ellen T. Noteware (*Pro Hac Vice*)
         Eric Lechtzin*
         BERGER & MONTAGUE, P.C.
         1622 Locust Street
         Philadelphia, Pennsylvania 19103-6365

26

Telephone: (215) 875-3000
tcollins@bm.net
scarson@bm.net
enoteware@bm.net
elechtzin@bm.net

*Attorneys for Plaintiffs*

*(Application for Admission to Practice
forthcoming)

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July, 2018, I electronically filed a true and correct

copy of the foregoing document with the Clerk of the Court using the CM/ECF system which will

send notification to the following:

Brian T. Ortelere (*Pro Hac Vice*)
Jeremy P. Blumenfeld (*Pro Hac Vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103
Tel.: 215-963-5000
Fax: 215-963-5001
brian.ortelere@morganlewis.com
jeremy.blumenfeld@morganlewis.com

Christopher J. Boran (*Pro Hac Vice*)
Matthew A. Russell (*Pro Hac Vice*)
Hillary E. August (*Pro Hac Vice*)
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, IL 60601
Tel.: 312-324-1000
Fax: 312-324-1001
christopher.boran@morganlewis.com
matthew.russell@morganlewis.com
hillary.august@morganlewis.com

Mark F. Enenbach (15202)
James J. Frost (16560)
MCGRATH NORTH MULLIN &
KRATZ, PC, LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, NE 68102-1627
Tel.: 402-341-3070
Fax: 402-341-0216
menenbach@mcgrathnorth.com
jfrost@mcgrathnorth.com

*Attorneys for Defendants*

> */s/ Kelle J. Winter*
> Kelle J. Winter

28